Hillsborough-northern judicial district
No. 2011-228

## GREAT AMERICAN INSURANCE COMPANY

v.

## ROBERT CHRISTY, ESQUIRE & a.

Argued: March 8, 2012
Opinion Issued: September 28, 2012

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Margaret H. Nelson* on the brief and orally), for the plaintiff.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*James Q. Shirley* on the brief and orally), for defendants Robert Christy and Christy & Tessier, P.A.

*Backus, Meyer & Branch, LLP*, of Manchester (*B.J. Branch* on the brief, and *Barry M. Scotch* orally), for defendant Debra Johnson.

*Getman, Schulthess & Steere, P.A.*, of Manchester (*Stephen J. Schulthess* on the brief and orally), for defendant Kathleen Tremblay.

*Law Office of Steven M. Latici, P.A.*, of Gilmanton (*Steven M. Latici* on the brief and orally), for intervenor Frederick Jakobiec, M.D.

*Bernstein Shur, P.A.*, of Manchester (*Andru H. Volinsky* and *Edward J. Sackman* on the brief), for New Hampshire Association for Justice, as *amicus curiae*.

CONBOY, J. The defendants, Robert Christy, Christy & Tessier, P.A., Debra Johnson, and Kathy Tremblay, appeal a decision of the Superior Court (*Tucker*, J.) rescinding a professional liability policy issued by the plaintiff, Great American Insurance Company (GAIC), to the law firm of Christy & Tessier, P.A. We reverse and remand.

We set forth the relevant facts as presented in the parties' agreed statement of facts. Robert Christy (Christy) and Thomas Tessier (Tessier) were partners in the firm of Christy & Tessier, P.A., practicing together for over forty-five years. In August 1987, Frederick Jakobiec, M.D. (Jakobiec) retained Tessier to draft a will for him. In 2001, Jakobiec's mother, Beatrice Jakobiec (Beatrice), died intestate. Her two heirs were Jakobiec and his brother, Thaddeus Jakobiec (Thaddeus). Thaddeus had been blind since birth, was developmentally disabled, and resided with his mother in her home in Manchester, which she owned with Jakobiec as joint tenants with rights of survivorship.

In May 2001, Jakobiec asked Tessier, who was Beatrice's nephew, to handle the probate administration for his mother's estate. In June 2002, the probate court appointed Tessier to administer the estate. From 2002 through 2005, Tessier created false affidavits and powers of attorney, which he used to gain unauthorized access to estate accounts and assets belonging to Jakobiec and Thaddeus. Tessier misappropriated for his personal use estate assets and assets belonging to Jakobiec and Thaddeus.

There is no evidence that Christy was aware of Tessier's thefts and misappropriations. However, Christy's actions at various times enabled Tessier to gain access to, and steal money and misappropriate assets belonging to, the estate and Jakobiec. On two separate occasions, in 2003 and 2005, Christy falsely notarized documents by purportedly witnessing the signatures of Thaddeus and Jakobiec when in fact they were not present. In addition, in 2002, Christy acted as the appraiser for purposes of an inventory submitted by Tessier to the probate court wherein Christy accepted Tessier's identification of the estate's assets without independent examination. The inventory was inaccurate, however, in that it did not disclose that Tessier had wrongly diverted funds from the estate.

Defendant Debra Johnson (Johnson), a long-time employee of Christy & Tessier, P.A., worked part-time as Tessier's secretary during the time Tessier represented Beatrice's estate. She was also a notary public and, in 2002, falsely notarized a durable power of attorney for health care from Thaddeus to Tessier on which Christy had falsely attested to the signature

and state of mind of Thaddeus. Defendant Kathy Tremblay (Tremblay), also a long-time employee of the firm, served as its part-time bookkeeper during the time that Tessier represented Beatrice's estate. Tremblay worked one day a week paying bills, making deposits into either the trust account or the operating account, and assembling materials for the firm's accountants. She gave Christy and Tessier a weekly handwritten report on the status of the firm's finances.

On June 26, 2006, Attorney Regina Rockefeller (Rockefeller), representing Jakobiec, met with Tessier to discuss his representation of the estate. Rockefeller described the meeting as "cordial," but noted that Tessier's "story did not hang together." Tessier called Rockefeller the next day and told her he had taken money from the estate, Jakobiec, and Thaddeus, and promised to make restitution.

On October 10, 2006, Rockefeller wrote to Tessier's counsel regarding claims arising out of Tessier's administration of the estate. According to Rockefeller, Tessier acknowledged forging the power of attorney for Jakobiec, making false declinations on behalf of Jakobiec of his interest in his mother's estate, falsifying two deeds, forging a power of attorney on behalf of Thaddeus, and filing false documents with the probate court. Rockefeller also alleged that Tessier owed Jakobiec more than $754,000 in assets from his mother's estate and more than $800,000 that Tessier took, by use of the forged power of attorney, from Jakobiec's personal bank and brokerage accounts between April 29, 2003, and May 31, 2006. Rockefeller indicated that as of October 10, 2006, Tessier had repaid Jakobiec approximately $460,000.

Following negotiations between their counsel, Tessier and Jakobiec entered into a settlement agreement dated April 1, 2007, in which Tessier acknowledged a debt to Jakobiec and established a payment plan to satisfy his remaining obligations. On September 28, 2007, Tessier's counsel advised Rockefeller in writing that despite an initial cash payment of $55,000 and the sale of certain real estate in Vermont that was deeded to Jakobiec under the settlement agreement, Tessier would not be able to pay the remaining amount owed under the settlement agreement.

GAIC first issued a professional liability policy to the law firm of Christy & Tessier effective August 1, 2001, and issued policies on an annual basis thereafter. Issuance of the successive policies required completion of renewal applications, which were reviewed by GAIC's underwriters. The basic policy remained the same from 2001 through 2007.

On May 22, 2007, two months after Tessier and Jakobiec entered into the settlement agreement, Christy executed a renewal application for professional liability coverage on behalf of the law firm. Question 6(a) on the renewal application asked: "After inquiry, is any lawyer aware of any claim,

incident, act, error or omission in the last year that could result in a professional liability claim against any attorney of the Firm or a predecessor firm?" Christy's answer on behalf of the firm was "No." The application also contained the following acknowledgment: "The undersigned proprietor, partner, member, or officer, acting on behalf of the applicant, and all other proposed Insureds, hereby declares after diligent inquiry that the above statements are true and that no material facts have been suppressed or misstated."

According to Christy, he asked Tessier whether he had any information that should be disclosed on the application and Tessier told him there was none. GAIC issued a professional liability policy to the firm effective August 1, 2007, through August 1, 2008. The first notice to GAIC about Tessier's misappropriations was by letter from Christy dated January 17, 2008. Subsequently, Christy advised GAIC of his 2003 improper notarization of a power of attorney from Jakobiec to Tessier.

In its petition for declaratory judgment, GAIC requested that the court: (1) "rule that GAIC's Policy . . . for the period August 1, 2007-August 1, 2008 is rescinded"; (2) "[o]rder the Respondents to reimburse GAIC for any costs, including legal fees it has incurred in defending the Respondents"; and (3) "[i]n the alternative, declare and rule that GAIC has no obligation to defend and indemnify Christy & Tessier, P.A., Robert Christy and Debra Johnson with respect to the underlying action." Following a hearing, the trial court granted GAIC's request for rescission.

The trial court found that Christy's negative answer to the question in the renewal application asking "[a]fter inquiry, is any lawyer aware of any claim, incident, act, error or omission in the last year that could result in a professional liability claim against any attorney of the Firm or a predecessor firm," was false "since Tessier at least knew of Dr. Jakobiec's claim against him in 2006." In addition, the trial court found that Christy's acknowledgment, that "[t]he undersigned . . . acting on behalf of the applicant and all other proposed Insureds, hereby declares after diligent inquiry that the above statements are true and that no material facts have been suppressed or misstated," was also false "in that the negative answer to the preceding question was untrue and Tessier suppressed the fact of Dr. Jakobiec's claim." The trial court reasoned that "[e]ven though Christy's answer to the question and his subsequent declaration on the application were unwittingly false, the question on the application did not pertain solely to Christy's knowledge, but rather to the knowledge of 'any lawyer' at the law firm. . . . Accordingly, Tessier's knowledge was imputed to Christy and the other insureds." Because the settlement agreement between Tessier and Jackobiec was conditional, the trial court found that "Tessier knew

when he spoke with Christy that Jakobiec's claim could result in a professional liability claim against him."

The trial court also found that the misstatements in the application were material. The court based its finding on the uncontested testimony of GAIC's underwriting unit manager that "[i]nformation about the facts giving rise to the Jakobiec claim and Mr. Tessier's acknowledgment of liability and his execution of the Settlement Agreement with Dr. Jakobiec were . . . important to the underwriting evaluation as to whether to renew the Policy" and would have caused GAIC to decline to renew the policy if it had been informed of the facts. Finally, the trial court found that rescission was not substantially unfair to defendants Christy and Johnson, because they "knowingly violated their duties in witnessing documents and in doing so aided Tessier, albeit unwittingly, in the commission of his crimes." Thus, the court did not find that these violations constituted the basis for rescission; neither did the court address whether these violations would warrant non-coverage under the policy's provisions.

On appeal, the defendants argue that rescission was improper because: (1) Christy's answer to question 6(a) on the renewal application was objectively true; (2) rescission of the policy or denial of coverage would be substantially unfair to Christy and the other innocent insureds who neither knew nor could have known of Tessier's fraud; and (3) the alleged misrepresentation was made on a renewal application as opposed to an initial policy application. GAIC argues that rescission as to all insureds is the sole appropriate remedy given the material misrepresentations in the law firm's renewal application. We note at the outset that Tessier failed to file an appearance in this case and the trial court entered an order of final default against him in March 2009.

 The interpretation of insurance policy language is a question of law for this court to decide. *Bianco Prof. Assoc. v. Home Ins. Co.*, 144 N.H. 288, 292 (1999). "We take the plain and ordinary meaning of the policy's words in context, and we construe the terms of the policy as would a reasonable person in the position of the insured based on more than a casual reading of the policy as a whole." *Id.* (quotation omitted). "Policy terms are construed objectively; where the terms are clear and unambiguous, we accord the language its natural and ordinary meaning." *Brown v. Concord Group Ins. Co.*, 163 N.H. 522, 525 (2012) (quotation omitted). To the extent that a provision in an insurance contract is unclear, ambiguities must be construed in favor of the insured and against the insurer. *Calabraro v. Metropolitan Prop. & Cas. Ins. Co.*, 142 N.H. 308, 310 (1997). A policy exclusion is enforceable only if it is "so clear . . . as to create no ambiguity

that might affect the insured's reasonable expectations." *Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co.*, 151 N.H. 649, 653 (2005).

The Shortform Application submitted by Christy to renew the claims-made policy with GAIC for the 2007-2008 policy year states that "this application will be the basis of the contract if a policy is issued," and that "the Company in providing coverage will have relied upon, as representations, the declarations and statements which are contained in or attached to or incorporated into the policy." In addition, the Policy Coverage Form states that the policy is issued "in reliance upon the statements in the application, and subject to the Limits of Liability shown in the Declarations, and subject to all of the terms of this insurance." Accordingly, in interpreting the agreement between the parties we consider the contract as a whole, including both the Shortform Application and the policy language.

Section I of the policy, titled Coverage, provides:

> A. This policy shall pay on behalf of each Insured all sums . . . which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD
>
>> (i) caused by any act, error or omission for which the Insured is legally responsible . . .
>
> and, in each case, arising out of the rendering or failure to render professional legal services, PROVIDED ALWAYS THAT such act, error or omission . . . happens:
>
>> 1. during the policy period; or
>
>> 2. prior to the policy period, provided that prior to the effective date of the first [Policy] issued by the Company to the Named Insured and continuously renewed and maintained in effect to the inception of this policy period:
>
> . . .
>
>>> (b) the Insured had no reasonable basis to believe that the Insured had breached a professional duty or to foresee that a claim would be made against the Insured . . . .

Section IV, titled Exclusion, provides:

A. This policy does not apply:

 1. to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions committed by any Insured, however, the Company will defend allegations of the foregoing acts or omissions until the time that the act or omission is factually proven;

. . . .

B. Waiver of Exclusion (Innocent Insured) and Breach of Conditions: *Whenever coverage under any provision of this policy would be excluded,* suspended or lost

 1. because of Section IV, Exclusions, sub-section 1, relating to any judgment or final adjudication based upon or arising out of any dishonest, deliberately fraudulent, criminal, malicious or deliberately wrongful acts or omissions by any Insured, or

 2. because of noncompliance with Section VII, Claims, subsection A, Notice of Claims relating to the giving of notice to the Company with respect to which any other Insured shall be in default *solely because of the default or concealment of such default by one or more Insureds responsible for the loss or damage* otherwise insured hereunder,

the Company agrees that *such insurance as would otherwise be afforded under this policy shall apply with respect to each and every insured who did not personally participate in committing one or more of the acts, errors or omissions described in either such exclusion or such condition*; provided that if the condition be one with which such Insured can comply after receiving knowledge thereof, the Insured entitled to the benefit of the Waiver of the Exclusion and Breach of Conditions shall comply with such condition promptly after obtaining knowledge of the failure of any other Insured to comply therewith.

(Emphasis added.)

Section VII, titled Claims, provides:

A. Notice of Claims: The Insureds shall, as soon as practicable, give to the Company written notice of any claim(s) or potential claim(s) made against any Insured.

Applying the plain and ordinary meaning of these provisions, under the innocent insured provision in Section IV, B, where a claim has gone unreported in violation of the notice provision set forth in Section VII because an insured concealed wrongful acts from the other insureds, GAIC must provide coverage to those insureds who did not "personally commit or personally participate" in the act, error or omission. Thus, an insured who does not have actual knowledge of the wrongful acts and, therefore, does not have the ability to report them and the foreseeable claims that may arise from them, is entitled to coverage provided the insurer is notified promptly after the insured obtains knowledge of the wrongful acts.

The innocent insured provision shows that the parties intended to distinguish actual from imputed knowledge and not to penalize insureds who did not have actual knowledge of wrongful acts. *See Maher & Williams v. ACE American Ins. Co.*, No. 3:08cv1191, 2010 WL 3546234, at *13 (D. Conn. Sept. 3, 2010); *see also Holloway v. Sacks and Sacks, Esqs.*, 713 N.Y.S.2d 162, 164 (App. Div. 2000). Prior to executing the renewal application for professional liability insurance coverage in May 2007, Christy inquired of Tessier whether he was aware of any information that should be disclosed on the renewal application and Tessier told him that there was none. Christy had no actual knowledge of Tessier's misconduct, and the policy expressly precludes imputing Tessier's knowledge "to each and every Insured who did not personally participate in committing" wrongful acts by another insured.

Question 6(a) on the renewal application asked: "After inquiry, is any lawyer aware of any claim, incident, act, error or omission in the last year that could result in a professional liability claim against any attorney of the Firm or a predecessor firm?" GAIC argues that this question "did not simply ask for information which . . . Christy . . . felt was true and accurate based on his personal knowledge. Rather the application required a complete and truthful response about claims and incidents in the last year that could give rise to a claim as to the Firm and all proposed Insureds which GAIC would be relying on in deciding whether to issue any policy." It is not clear, however, that the policy provision excluding imputed knowledge to innocent insureds does not apply to giving notice on the Shortform Application. Thus, in the absence of language specifically imputing knowledge to innocent insureds of false statements made on the Shortform Application, the contract read as a whole is ambiguous. "In view of the ambiguity, we will read the policy against the insurer in order to honor the reasonable expectations of the policyholder." *Cacavas v. Maine Bonding & Casualty Co.*, 128 N.H. 204, 207 (1986). Of course, an insurance company can preclude interpretation of language against it by including

"clear and unambiguous policy language." *See Orleans v. Commercial Union Ins. Co.*, 133 N.H. 493, 496 (1990).

We hold that the trial court erred as a matter of law in ruling that Tessier's knowledge is imputed to Christy and the other defendants thereby voiding the policy *ab initio*. We make no ruling, however, as to whether any of the defendants' conduct would result in non-coverage under the policy and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.