NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2015-0624


EXETER HOSPITAL, INC.

v.

STEADFAST INSURANCE COMPANY

Argued: October 19, 2016
Opinion Issued: June 22, 2017

Sheehan Phinney Bass & Green, PA, of Manchester (James Q. Shirley and Jason D. Gregoire on the brief, and Mr. Shirley orally), for the petitioner.

McLane Middleton, Professional Association, of Manchester (Jeremy T. Walker and Nicholas F. Casolaro on the brief), and Chadbourne & Parke LLP, of Washington, D.C. (Joy L. Langford and Samantha Miller on the brief, and Ms. Langford orally), for the respondent.

CONBOY, J. In this declaratory judgment proceeding, the petitioner, Exeter Hospital, Inc. (Exeter), appeals an order of the Superior Court (Anderson, J.) denying its motion for partial summary judgment as to the amount at which coverage is triggered under an umbrella policy (the policy) issued to Exeter by the respondent, Steadfast Insurance Company (Steadfast). We reverse and remand.

The summary judgment record reflects the following pertinent facts. In the spring of 2011, Exeter hired a cardiovascular technician (technician) to work in its Cardiac Catheterization Laboratory (Lab). In October 2011, the technician became a full-time employee. In the spring of 2012, an outbreak of Hepatitis C infections among patients serviced by the Lab led investigators to discover that the technician had spread the virus to patients "through a clandestine drug diversion scheme." The technician allegedly injected certain drugs into his body by way of intravenous needles. He then used the same needles on patients thereby infecting them with the Hepatitis C virus. The technician's actions resulted in numerous lawsuits against Exeter by affected patients.

During the relevant time period, Exeter was primarily insured through a Self-Insurance Trust Agreement (SIT), which provided professional liability coverage in the amount of $1 million per medical incident, with a $4 million annual aggregate cap. Exeter also maintained the policy with Steadfast, which provided excess health care professional liability coverage. The policy set the following limits on coverage: a specific loss limit of $20 million, a health care professional liability aggregate limit of $20 million, and a "Retained Limit" of $100,000.

Section I.A.1 of the policy, titled "Coverage A – Health Care Professional Liability Insurance" (Coverage A), provides, in pertinent part, that Steadfast "will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages because of injury caused by a medical incident to which this insurance applies." (Bolding omitted.) It further provides that Steadfast "will pay only such damages that are in excess of the Retained Limit specified in Item 4. of the Declarations or that are in excess of the applicable underlying limit, whichever is greater." (Bolding omitted.) The term "Retained Limit" is not specifically defined in the policy; however, the policy's declarations list the "Retained Limit" as $100,000. "Applicable underlying limit" is defined as "the total of all available limits of insurance for the underlying insurance plus any alternative insurance." (Bolding omitted.) "Underlying insurance means the policy or policies of insurance listed in the Schedule of Underlying Insurance, forming a part of this policy." (Bolding omitted.) "Alternative insurance means any type of self-insurance or other mechanisms by which an insured arranges for funding of legal liabilities and is listed in the Schedule of Underlying Self-Insurance." (Bolding omitted.) It is undisputed that Exeter maintained only alternative insurance — the SIT.

In August 2013, after Exeter had paid approximately $3 million in claims through the SIT, Steadfast accepted Exeter's tender of the defense of the remaining claims. In doing so, Steadfast informed Exeter that "each claimant constitutes a separate medical incident." Steadfast further stated that, once Exeter's $4 million aggregate limit was exhausted, it would "pay only such damages that are in excess of the Retained Limit of $100,000. The Retained

Limit is the minimum amount for which Exeter is liable for each and every claim, following exhaustion." When Exeter paid out its $4 million annual aggregate under the SIT, Steadfast notified Exeter that:

> As Exeter has now exhausted its self-insurance aggregate limit of $4,000,000.00 there no longer exists an applicable underlying limit (because the underlying self-insurance is exhausted) to be compared to the Retained Limit for purposes of determining "whichever is greater." Thus, for purposes of determining what portion of damages Steadfast is obligated to reimburse in connection with damages for a medical incident that are incurred post-exhaustion of the self-insured aggregate, the Retained Limit is necessarily the trigger as exhaustion of the underlying self-insurance means there is no longer an applicable underlying limit to compare to the Retained Limit.

(Bolding omitted.) Thus, Steadfast maintained that it would pay damages only in excess of the $100,000 retained limit for each medical incident.

In May 2014, Exeter filed this declaratory judgment proceeding, seeking a declaration that it is not required to pay the "$100,000 retained limit per claim for those claims that settle or that are reduced to judgment after August 1, 2013." Exeter also asserted a breach of contract claim against Steadfast, arguing that it is entitled to recovery of excess payments from Steadfast "because the writs brought against Exeter assert claims that constitute a single 'medical incident'" and, therefore, Exeter should only have "been required to satisfy the single $1.0 million limit of its self[-]insurance in order to trigger Steadfast's obligations of defense and indemnification." Subsequently, Exeter moved for partial summary judgment on its request for a declaratory judgment, arguing that, pursuant to the policy, once it paid its $4 million annual aggregate, it did not have to pay the retained limit amount of $100,000 for each remaining claim. Steadfast objected.

Following a hearing, the trial court denied Exeter's motion. The court identified "[t]he crux of the dispute between the parties" as being the interpretation of the clause in Coverage A limiting Steadfast's liability to the "excess over the greater of the retained limit [or] the applicable underlying limit." The court then interpreted the term "applicable underlying limit" as being a variable amount "dependent on the actual coverage remaining under [the] other [limits of] insurance," here, the limits of the SIT. Because Exeter had paid out the limits of the SIT, the court found that the "applicable underlying limit" was zero, thereby rendering the $100,000 retained limit greater than the "applicable underlying limit." Thus, the court determined that, pursuant to Coverage A, Steadfast is required "to pay damages in excess of $100,000 for each medical incident." Exeter sought reconsideration of the court's order, which the court denied.

In September 2015, the court approved the parties' stipulation for entry of final order regarding all remaining issues, thereby dismissing Exeter's claim that it is entitled to recovery because the actions against it constituted a single medical incident requiring it to satisfy only its $1 million self-insured obligation rather than its $4 million annual aggregate obligation. This appeal followed.

In reviewing a trial court's summary judgment ruling, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. Rivera v. Liberty Mut. Fire Ins. Co., 163 N.H. 603, 606 (2012). "If our review of the evidence does not reveal a genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision." Amica Mut. Ins. Co. v. Mutrie, 167 N.H. 108, 111 (2014) (quotation omitted). We review the trial court's application of law to the facts de novo. Rivera, 163 N.H. at 606.

"In a declaratory judgment action to determine the coverage of an insurance policy, the burden of proof is always on the insurer, regardless of which party brings the petition." Cogswell Farm Condo. Ass'n v. Tower Group, Inc., 167 N.H. 245, 248 (2015) (quotation omitted). The interpretation of insurance policy language is a question of law for this court to decide. Bartlett v. Commerce Ins. Co., 167 N.H. 521, 530 (2015). "The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties." Id. (quotation omitted). To discern the parties' intent, we begin with an examination of the insurance policy language. Id. In interpreting policy language, we look to the plain and ordinary meaning of the policy's words in context. Id. We construe the terms of the policy as would a reasonable person in the position of the insured based upon more than a casual reading of the policy as a whole. Id. at 530-31. This is an objective standard. Great Am. Dining v. Philadelphia Indem. Ins. Co., 164 N.H. 612, 616 (2013). Where an insurance policy's language is reasonably susceptible of more than one interpretation, however, and one reasonable interpretation favors coverage, we construe the ambiguity against the insurer and in favor of coverage in order to honor the reasonable expectation of the policyholder. State Farm Mut. Ins. Co. v. Pitman, 148 N.H. 499, 501 (2002). "The doctrine that ambiguities in an insurance policy must be construed against the insurer is rooted in the fact that insurers have superior understanding of the terms they employ." Id. (quotation omitted).

Exeter argues that the trial court erred by finding that, after it has satisfied the $4 million aggregate limit of its self-insurance, it is required to pay the retained limit of $100,000 for each claim before Steadfast will provide coverage. It contends that Coverage A "requires Exeter to pay either the amount of its alternative insurance (the limit of the SIT) or the retained limit, [but] not both." (Bolding omitted.) Because the $4 million aggregate limit of

the SIT is greater than the $100,000 retained limit, Exeter maintains that it has to pay only the $4 million limit and, thereafter, Steadfast will be responsible for coverage under the policy.

The policy language at issue here, Coverage A, provides that Steadfast

> will pay on behalf of the **insured** those sums that the **insured** becomes legally obligated to pay as damages because of injury caused by a **medical incident** to which this insurance applies. We will pay only such damages that are in excess of the Retained Limit specified in Item **4.** of the Declarations or that are in excess of the **applicable underlying limit**, whichever is greater.

The first sentence of Coverage A explains that Steadfast will insure against damages resulting from injury caused by a medical incident to which the policy applies.

The second sentence provides that Steadfast will "pay only such damages that are in excess of the Retained Limit specified in Item 4. of the Declarations or that are in excess of the applicable underlying limit, whichever is greater." (Bolding omitted). The use of the disjunctive "or" in this provision establishes two alternative triggering points for coverage — when damages are in excess of the retained limit, here, $100,000, or when damages are in excess of the applicable underlying limit. Cf. Appeal of Niadni, Inc., 166 N.H. 256, 261 (2014) (explaining that use of disjunctive in statute means only one of two alternatives need be shown); Unit Owners Assoc. of Summit Vista v. Miller, 141 N.H. 39, 45 (1996) (finding that use of disjunctive "or" in New Hampshire Consumer Protection Act manifests clear intent to award multiple damages for either knowing or willful acts); Legacy Vulcan Corp. v. Superior Court, 110 Cal. Rptr. 3d 795, 804 (Ct. App. 2010) (interpreting "retained limit" in policy's insuring agreement, which was defined "as the greater of the limits of liability in the 'underlying insurance listed in Schedule A plus the applicable limits of any other underlying insurance collectible by the Insured'" or "the amount (i.e., $100,000) specified in the declarations as to [insured's] liability 'not within the terms of the coverage of the underlying insurance listed in Schedule A'" as meaning that insurer had no indemnity obligation "unless and until all underlying insurance [had] been exhausted or if there [was] no coverage for the claim under any of the Schedule A policies, and the total policy limits of all 'other' collectible underlying insurance [did] not exceed $100,000, then [insurer's] indemnity obligation shall be limited to amounts in excess of $100,000" (ellipsis omitted)).

Whether the "Retained Limit" or the "applicable underlying limit" applies will necessarily depend upon "whichever [limit] is greater." (Bolding omitted.) Accordingly, as the trial court explained, to determine the extent of coverage

when there are damages because of injury caused by a medical incident, "the parties must assess whether the retained limit or applicable underlying limit applies," which in turn, requires an examination of the value of the applicable underlying limit.

As defined in the policy, "[a]pplicable underlying limit means the total of all available limits of insurance for the underlying insurance plus any alternative insurance." (Bolding omitted.) It is undisputed that Exeter did not maintain underlying insurance, but instead had alternative insurance. The policy defines "[a]lternative insurance" to mean "any type of self-insurance or other mechanisms by which an insured arranges for funding of legal liabilities and is listed in the Schedule of Underlying Self-Insurance." The policy further defines "[s]elf insured retention" as

> any amounts listed on the Schedule of Underlying Self Insurance, forming a part of this policy. <u>It is the amount the insured must pay</u>, including underlying expenses, for each claim before we will pay claims for which insurance is provided under the applicable coverage, subject to the terms and conditions of this policy.

(Emphasis added; bolding omitted.) The policy's schedule of underlying self-insurance lists Exeter's SIT limits of $1 million per medical incident and $4 million aggregate for the annual policy period.

Exeter argues that nothing in the language of Coverage A demonstrates "that [the] applicable underlying limit is not exactly what it says, a limit," but instead "reduces as Exeter pays claims such that it becomes less than the $100,000 retained limit." (Bolding omitted.) Exeter maintains that "alternative insurance" does not become unavailable for purposes of the "whichever is greater" comparison in Coverage A because the use of the word "any" before the phrase "alternative insurance" in the definition of "applicable underlying limit" disconnects the phrase "the total of all available limits of insurance for the underlying insurance" from the phrase "alternative insurance." (Bolding omitted.)

Exeter further contends that "[a]bsent a clear definition of 'Retained Limit' [in Coverage A] and of the words 'available limits'" used in the definition of "applicable underlying limit," "a reasonable insured would not understand the retained limit [referenced in Coverage A] to serve as a per-case deductible upon satisfaction of the self-insured retention." It maintains that a reasonable person in its position would not understand that the words "available limits" in the definition of "applicable underlying limit" means the amount of insurance remaining after the insured has paid out the limits of its alternative insurance. It asserts that, had Steadfast meant for its alternative insurance to constitute a variable amount that decreases as the insured pays out claims, it could have

6

"defined 'available limits' to mean 'the amount of the underlying insurance after being reduced by the payment of claims.'" Cf. Donald B. MacNeal, Inc. v. Inter. Fire & Cas., 477 N.E.2d 1322, 1325 (Ill. App. Ct. 1985) (concluding that language in excess insurance policy stating that insurer would indemnify "the insured for 'the ultimate net loss in excess of the retained limit,' where 'retained limit' was defined as 'the total of the applicable limits of the underlying policies'" meant that "excess insurer would pay for losses in excess of a fixed amount, the primary policy limits" in contrast to "'amount recoverable'" language, which could "be interpreted as a variable amount which depends on the actual amount recoverable from the primary insurer, not the fixed policy limits").

Exeter cites section VII.W of the policy to support its interpretation of the policy. Section VII.W provides that Steadfast will not pay damages under the policy "until the insured, or the insured's underlying insurer has paid or is legally obligated to pay the full amount of the Underlying Limits of Insurance, Underlying Self-Insurance or Retained Limit." (Bolding omitted.) Exeter contends that "[w]hen considered with [Coverage A], a reasonable person in Exeter's position would conclude that Steadfast's coverage is triggered after Exeter has exhausted either the aggregate limits of its SIT or payment of the retained limit, not both." Cf. Goodyear Tire & Rubber Co. v. Travelers Cas. and Surety Co., Civil Action No. 13–00256, 2014 WL 7338717, at *2 (W.D. Pa. Dec. 22, 2014) (stating that policy defined "retained limit" as "the greater of (1) the total amount of the applicable limits of liability of any underlying insurance or (2) the deductible amount stated in Item 4 of the declarations" and explaining that because the amount of applicable underlying limits of liability of underlying insurance was "higher than the generally applicable deductible of $100,000 specified in Item 4 of the declarations, this deductible was irrelevant to the determination of coverage for" specified damages under the policy (quotations omitted)).

Steadfast, on the other hand, argues that the word "available" as used in the definition of "applicable underlying limit," means the amount of underlying insurance and alternative insurance when "the damages for a medical incident are incurred." It contends that, here, because Exeter's alternative insurance "contains an aggregate limit, the coverage it provides can be exhausted." It maintains that, because the $4 million aggregate limit has "been exhausted due to payment of claims," that limit is "no longer 'available'" within the meaning of "applicable underlying limit" and, therefore, the "applicable underlying limit" is zero. Steadfast maintains that the "applicable underlying limit" must be interpreted as a variable amount because otherwise the "Retained Limit" and the "whichever is greater" language in Coverage A would be rendered meaningless. (Bolding omitted.)

Steadfast further argues that defining the "applicable underlying limit" as "a fixed number that is never subject to reduction or exhaustion for purposes

7

of comparison to the retained limit is contradicted by other provisions in the" policy. Specifically, it cites section II.E, which provides that "[a]ny self insured retention amount listed on the Schedule of Underlying Self-Insurance is eroded or exhausted only by the actual payment of claims that would be insured by the provisions of this policy." (Bolding omitted.) Steadfast also cites section VII.L.2.b, which states that, during the policy period, the insured agrees "[t]hat the applicable underlying limit will be maintained except for any reduction or exhaustion of limits by payment of claims covered by alternative insurance or underlying insurance." (Bolding omitted.) Steadfast also asserts that the "differing retention language utilized in" the insuring agreements for Coverage B and Coverage C evince that Coverage A "expressly provides that where the designated underlying coverage ('the applicable underlying limit') is no longer available and thus exhausted below $100,000, the separate $100,000 Retained Limit applies."

In addition, Steadfast points to the trial court's notation that section VII.A, governing appeals, "provide[s] further support that Exeter's alternative insurance is [a] variable amount." Section VII.A provides, in pertinent part, that "[i]n the event you or any underlying insurer elects not to appeal a judgment in excess of the amount of the applicable underlying limit, we may elect to appeal at our expense." (Bolding omitted.) In doing so, Steadfast suggests that, if the "applicable underlying limit" is a static amount, it would never be able to appeal a judgment less than the "applicable underlying limit" despite its potential liability.

Exeter disputes Steadfast's argument that the retained limit and the "'whichever is greater'" language in Coverage A are rendered meaningless if the "'applicable underlying limit'" is defined as a fixed amount in this case. Exeter contends that "the policy form used for [it] was setup so that it could be adapted to insureds in different circumstances," including when the insured has underlying insurance. Thus, it maintains that conceivably there are circumstances in which the "'applicable underlying limit'" would be zero because the underlying insurance would not apply and, as a result, the retained limit in Coverage A would be greater than the "'applicable underlying limit'" and, therefore, the retained limit would apply.

Exeter further contends that "[t]he fact that other provisions reference 'erosion' or 'exhaustion' of alternative insurance does not contradict [its] position." (Italics and capitalization omitted.) Exeter asserts that nothing in these provisions "tie[s] the concept of reduction, erosion, or exhaustion to the concept of unavailability." Rather, Exeter argues that sections II.E and VII.L.2.b "simply reaffirm that [it] is required to satisfy its $4.0 million aggregate limit before Steadfast's umbrella coverage is triggered" — "an issue separate and distinct from whether Exeter is required to pay a $100,000 per-claim retained limit" under Coverage A after it has paid out its aggregate limit.

8

Cf. Royal Surplus Lines Ins. Co. v. Delta Health Group, Inc., No. 3:03CV419–RS, 2006 WL 167565, at *5 (N.D. Fla. Jan. 23, 2006) (stating that "[t]he word 'covered' in the context of defining 'retained limit' is wholly independent of whether the actual underlying limit is exhausted"). Exeter further contends that Coverages B and C "apply to insureds in different circumstances" than that found in Coverage A. It, therefore, maintains that the language in those coverage provisions should not dictate how we interpret Coverage A.

We conclude that the foregoing arguments demonstrate a "reasonable disagreement between the contracting parties leading to at least two interpretations of the [policy's] language," Newell v. Markel Corp., 169 N.H. 193, 197 (2016) (quotation and brackets omitted). Although we do not agree with every underlying argument pressed by Exeter, we conclude that its overall argument regarding the interpretation of Coverage A is reasonable. We conclude that Coverage A could reasonably be construed as providing that once Exeter has paid out the $4 million aggregate limit of its alternative insurance, Steadfast becomes liable for "those sums that [Exeter] becomes legally obligated to pay as damages because of injury caused by a medical incident to which" the policy applies. (Bolding omitted.) Cf. General Star Indem. v. Superior Court, 55 Cal. Rptr. 2d 322, 326 (App. Ct. 1996) (explaining that once insured had exhausted aggregate limit of self-insured retention, insurance under excess policy would "cover any additional claims from dollar one"). This interpretation is further supported by the purpose of an umbrella policy. See CNA Ins. Co. v. Hartford Ins. Co., 129 N.H. 243, 248 (1987) (explaining that umbrella coverage is designed "to pick up where primary coverages end" (quotation omitted)); see also 4 New Appleman on Ins. L. Libr. Ed. § 24.02[3], at 24-17 (Dec. 2010) ("An umbrella policy is thus a 'gap filler'; by design it provides first dollar coverage where a primary policy and an excess policy do not." (footnote omitted)).

Steadfast, however, also offers a plausible interpretation, i.e., that once Exeter has paid out the $4 million aggregate limit of its alternative insurance, coverage will not be triggered under Coverage A until Exeter's "damages because of injury caused by a medical incident to which" the policy applies exceed the $100,000 retained limit. (Bolding omitted.) Accordingly, because we conclude that Coverage A is subject to more than one reasonable interpretation, and one of those interpretations provides coverage, an ambiguity exists that will be construed in favor of Exeter. See Great Am. Ins. Co. v. Christy, 164 N.H. 196, 203 (2012) ("In view of the ambiguity, we will read the policy against the insurer in order to honor the reasonable expectations of the policyholder." (quotation omitted)).

Because we rule in favor of Exeter, we need not address the other arguments Exeter raises on appeal.

Finally, Exeter has moved for leave to file notice of additional authority. Steadfast objects. Because our ruling today does not rely upon the authority cited by Exeter, we decline to rule upon Exeter's motion as it is moot.

Reversed and remanded.

DALIANIS, C.J., and HICKS and BASSETT, JJ., concurred; LYNN, J., concurred specially.

LYNN, J., concurring specially. I agree with the majority that the umbrella insurance policy here at issue is ambiguous and that one reasonable construction of the policy supports the insured's contention that, after it has exhausted the $4 million aggregate amount of underlying self-insurance that the policy requires it to maintain, the insurer is required to pay, within its policy limits, all claims incurred by the insured without regard to the $100,000 retained limit. However, because I arrive at this conclusion based on an analysis that differs from that employed by the majority, I write separately to explain my reasoning.

Exeter argues that the word "available" in the definition of "applicable underlying limit" modifies the phrase "underlying insurance," but that it does not modify the phrase "alternative insurance." (Bolding omitted.) Exeter contends that the use of the determiner "any" before "alternative insurance" disconnects the phrase "the total of all available limits of insurance for the underlying insurance" from the phrase "alternative insurance."[1] (Bolding omitted.) Exeter, therefore, maintains that "alternative insurance" does not become "unavailable" for purposes of the "whichever is greater" comparison in Coverage A. (Bolding omitted.) Because the Self-Insurance Trust Agreement (SIT) limits constitute "alternative insurance" within the meaning of "applicable underlying limit," and because, in its view, alternate insurance does not become unavailable as Exeter paid claims from the SIT, Exeter contends that the value of the "applicable underlying limit" is $4 million. (Bolding omitted.)

Steadfast counters that the word "available" modifies the phrase "limits of insurance," which includes both the limits of "underlying insurance" and the limits of "alternative insurance." (Bolding omitted.) Steadfast argues that, as used in the definition, the word "available" means the <u>amount</u> of underlying insurance and alternative insurance when "the damages for a medical incident are incurred." It contends that, because the SIT limits "have been exhausted due to payment of claims . . . those [limits] are no longer 'available'" within the

---

[1] I note that, in the trial court, Exeter claimed that it was the word "plus," rather than the word "any," which disconnected "available" from "alternative insurance." Because of this change, Steadfast maintains that Exeter's argument is not preserved. Because I see little substantive difference between Exeter's argument regardless of whether "any" or "plus" is relied upon as the alleged disconnector, I assume for purposes of this appeal that Exeter's argument is preserved.

10

meaning of "applicable underlying limit" and, therefore, the "applicable underlying limit" is zero.

I agree with Steadfast that the word "available" in the definition of "[a]pplicable underlying limit" modifies the phrase "limits of insurance," which refers to both "underlying insurance" and "alternative insurance." (Bolding omitted.) I also agree with Steadfast that use of the term "available" signifies that the insurance to which it applies (the "underlying insurance" and the "alternative insurance") must actually be accessible and capable of providing coverage for the incident, which is not the case when some or all of said insurance has been exhausted through the payment of claims. See Webster's Third New International Dictionary 150 (unabridged ed. 2002) (defining "available," as relevant here, to mean "VALID," "such as may be availed of : capable of use for the accomplishment of a purpose," and "that is accessible or may be obtained"). Thus, I disagree with Exeter that the "applicable underlying limit" is a fixed amount (in this case $4 million) that does not decline as claims are paid from the SIT. Indeed, if literally applied in this manner, i.e., as an amount that is not exhausted and reduced as claims are paid from the SIT, coverage would never be available under the umbrella policy except when the particular medical incident at issue generated a claim that itself exceeded $4 million; for any claim that did not exceed $4 million, the "applicable underlying limit" would be the fixed amount of $4 million regardless of whether Exeter had exhausted the SIT through payment of other claims. In other words, Exeter's construction of the policy language would effectively convert the $4 million annual aggregate limit into a $4 million per medical incident limit, which is clearly at odds with the way in which the policy is intended to operate (since such construction would render the $1 million per medical incident limit superfluous). See Int'l. Surplus Lines Ins. Co. v. Mfgs. & Merchants. Mut. Ins. Co., 140 N.H. 15, 19 (1995) ("we will not presume language in a policy to be mere surplus"). This of course is not the result for which Exeter advocates, yet it is the result that logically follows under Exeter's construction of the policy.

Exeter offers what it contends is a reasonable explanation for why the policy would differentiate between "underlying insurance" and "alternative insurance," by requiring that the former be "available" while the latter need not be. Under its view, an umbrella policyholder who has purchased "underlying insurance" has protected itself by doing so, and therefore requiring that the retained limit apply even when such coverage has been exhausted incentivizes the insured to act carefully post-exhaustion because it still has "skin in the game." In contrast, according to Exeter, an umbrella policyholder who self-insures for amounts below the level when umbrella insurance becomes available has already expended substantial sums of its own monies and therefore has no need to demonstrate additional "skin in the game" as to post-exhaustion claims. (Quotation omitted.) I find this argument unpersuasive. First, Exeter has not identified any explicit language in the policy that reflects a purpose to draw the level-of-skin-in-the-game distinction between "underlying

11

insurance" and "alternative insurance" that it urges.  As the trial court explained:

> Coverage A makes no distinction between types of insurance; it speaks in terms of the applicable underlying limit, which is a combination of both underlying and alternative insurance coverages.  Given that a single phrase is used to describe the nature and extent of coverage under Coverage A, the only reasonable interpretation is that both types of insurance are to be treated the same.

Moreover, I agree with the trial court's reasoning that, insofar as the purpose of the retained limit is to incentivize the policyholder to act carefully, "that purpose is not furthered by discharging all liability from the insured once he or she reaches the limits of self-insurance" because, regardless of what it may have paid to settle past claims, "[w]ithout any possible liability, Exeter would have no continuing incentive once it reached its self-insurance limits."[2]  The trial court's conclusion that the "applicable underlying limit," which includes "alternative insurance," is a variable amount that is reduced as claims are paid is also supported by other provisions of the policy.  Section II.E of the policy states that "[a]ny self insured retention amount . . . shall be considered <u>eroded</u> or <u>exhausted</u> only by the actual payment of claims . . . ."  (Bolding omitted; emphasis added.)  Section VII.L.2.b requires Exeter to maintain the "applicable underlying limit" "except for any <u>reduction</u> or <u>exhaustion</u> of limits by payment of claims covered by alternative insurance or underlying insurance."  (Bolding omitted; emphasis added.)  Section VII.A provides that, "In the event you [the insured] . . . elect[] not to appeal a judgment in excess of the amount of the applicable underlying limit, we [Steadfast] may elect to appeal at our expense."  (Bolding omitted.)  As the trial court aptly observed, this last provision would lead to an absurd result under Exeter's construction of the policy because it would mean that, if Exeter exhausted the alternative insurance limits of $1 million per medical incident/$4 million annual aggregate, Steadfast would be unable to appeal judgments in an amount less than those limits notwithstanding its liability, post-exhaustion, for such judgments.

The terms of Coverage B of the policy also support the trial court's interpretation of Coverage A.  Coverage B provides umbrella liability insurance for claims not involving health care professional liability.  The pertinent

---

[2] The trial court also observed that, at least arguably, a self-insured institution that has expended a significant sum of its own funds (here, $4 million) in payment of claims would have less incentive to expend additional funds on measures to reduce the possibility of medical incidents for which it no longer would have potential liability, due to coverage by the umbrella policy, than would an organization that did not have to make such expenditures because it had underlying insurance coverage.

provision of Coverage B states that Steadfast "will pay only such damages that are in excess of the Retained Limit specified in Item 4. of the Declarations or that are in excess of the amount payable by alternative insurance as listed in the Schedule of Underlying Self-Insurance, whichever is greater." Although Exeter appears to suggest that the use of the term "payable" in Coverage B, rather than "available" as in Coverage A, shows that, unlike in Coverage A, in Coverage B the alternative insurance does reduce as claims are paid, I am not persuaded that this difference in terminology was intended to draw such a distinction. In the context used here, I conclude that "available" and "payable" are merely alternative ways of indicating that the underlying coverage must actually be in existence and able to satisfy the claim at the time it is made. In fact, Exeter's argument on this point is inconsistent with its acknowledgment that, at least with respect to "underlying insurance," the use of the term "available" requires a reduction in the amount of such insurance as claims are paid. The more important point, in my view, is that under Coverage B, which applies in situations in which "alternative insurance," that is, self-insurance, provides the only form of underlying coverage, the policy nonetheless requires that the greater of the unexhausted self-insurance or the retained limit be satisfied before Steadfast becomes obligated to pay. Exeter offers no plausible explanation for why the policy would require exhaustion of the greater of these limits in the case of Coverage B, but not in the case of Coverage A.

Although the arguments discussed above are supportive of Steadfast's position that the "applicable underlying limit" is a variable amount that reduces as claims are paid, acceptance of this construction does not end our inquiry because it does not address Exeter's contention that the policy is ambiguous. Specifically, it does not answer the question of whether the policy contemplates that claims to which "underlying insurance" and/or "self-insurance" apply are the same claims to which the retained limit is intended to apply. As explained below, I conclude that the terms of the policy are ambiguous on this point.

Steadfast's position on this issue is straightforward: it asserts that because the "whichever is greater" language found in Coverage A requires a comparison between the "applicable underlying limit," on the one hand, and the retained limit, on the other, both limitations on its coverage must apply to the same claims. In other words, Steadfast argues that if the category of claims covered by "the applicable underlying limit" and by the retained limit were intended to be mutually exclusive there would be no need to require a comparison between the two. This is a reasonable argument.

The problem for Steadfast, however, is that another provision of the policy does not call for the comparison between the "applicable underlying limit" and the retained limit. Under the "Conditions" section of the policy, section VII.W does not contain the "whichever is greater" language found in the

13

section I "Insuring Agreements" that contains Coverage A. Rather, section VII.W states: "Coverage under this policy will not apply until the insured, or the insured's underlying insurer has paid or is legally obligated to pay the full amount of the Underlying Limits of Insurance, Underlying Self-Insurance or Retained Limit." (Bolding omitted.) The absence of comparison language in section VII.W contradicts the language of section I.A, and could reasonably be understood by an insured to mean that the claims to which underlying coverage applies are not the same as those to which the retained limit applies.[3] See Kelly v. Prudential Prop. & Cas. Ins. Co., 147 N.H. 642, 643 (2002) ("When an ambiguity arises from conflicting provisions of a policy, we resolve the inconsistency in favor of the insured."). For example, Exeter points out that there may be circumstances in which a claim does not fall within the "underlying insurance," and that, in such circumstances, the retained limit serves the useful function of acting as a deductible that must be satisfied before the umbrella policy provides coverage. Although the retained limit in this policy is not specifically defined so as to be limited in application to losses not covered by "underlying insurance," as is the case with respect to the policies at issue in the authorities upon which Exeter relies, see U.S. Fire Ins. Co. v. Charter Financial Group, 851 F.2d 957, 959 (7th Cir. 1988); Zurich Ins. Co. v. Heil Co., 815 F.2d 1122, 1124 (7th Cir. 1987); Gulezian v. Lincoln Ins. Co., 506 N.E.2d 123, 124 (Mass. 1987); Morbark Industries, Inc. v. Western Emp. Ins., 429 N.W.2d 213, 215 (Mich. Ct. App. 1988); U.S. Fire Ins. Co. v. Coleman, 754 S.W.2d 941, 943 (Mo. Ct. App. 1988), if Steadfast desired the retained limit to apply to both claims that fall within underlying coverage and those that do not, it bore the responsibility to draft the policy with language sufficient to eliminate any reasonable construction to the contrary.

At least two other provisions of the policy also can reasonably be read to support the view that the retained limit was not intended to apply to claims that are covered by "underlying insurance" or "alternative insurance." First, section III.A.1 gives Steadfast "the duty to assume control of the investigation and defend and settle any claim to which this insurance applies . . . [u]nder Coverage A . . . , when damages are sought for a medical incident . . . to which no underlying insurance or alternative insurance applies." (Bolding omitted; emphasis added.) Second, section VII.C provides:

---

[3] It must also be noted that if the retained limit is construed as applying to the same claims to which underlying insurance/self-insurance apply, then section VII.W is rendered nonsensical. The reason is that, without the comparison language (i.e., "whichever is greater") there is no way to know which one of the categories listed in the section as being a prerequisite to Steadfast's liability — (1) underlying insurance/self-insurance, or (2) the retained limit — is supposed to apply to a particular claim. Indeed, given the well-settled rule that ambiguities are to be construed in favor of the insured, under such a construction, Exeter would appear to have a plausible argument that because the retained limit is lower than the limits of underlying insurance/self-insurance Exeter is required to maintain, the retained limit would be the only amount Exeter is required to satisfy for each claim involving a medical incident. Exeter does not advance any such argument.

14

> In the event of bankruptcy, insolvency or refusal or inability to pay, of any insured or underlying insurer, the insurance afforded by this policy will not replace such alternative insurance or underlying insurance but will apply as if all the limits of any alternative insurance or underlying insurance are fully available and collectible.

(Bolding omitted.) Read together, these provisions effectively relieve Steadfast of so-called "drop down" liability with respect to claims that are covered by "underlying insurance" or "alternative insurance" but are not paid because of the bankruptcy, insolvency, or refusal or inability to pay of the insured or an underlying insurer. By negative implication, the clear import of these provisions is that for claims covered by its umbrella policy but that do not fall within any "underlying insurance" or "alternative insurance," Steadfast's liability can be triggered for losses below the amount of the coverage limits Exeter is required to maintain. Indeed, that is why Steadfast is given the ability to control the defense and settlement of such claims. If Steadfast did not have "drop down" liability in these circumstances, it would be implausible to construe the retained limit as intended to provide a deductible limited in application to these types of claims. But because it does have such liability, the retained limit insures that Steadfast's liability is not triggered with the first dollar of loss but only after Exeter has paid $100,000 toward the claim.

Construction of the retained limit as being applicable only to claims with respect to which there is no "applicable underlying limit" is generally consistent with the purpose of an umbrella policy, which, as the majority correctly notes, is designed to serve as a gap filler that provides first dollar coverage (or, here, first dollar coverage for losses above a $100,000 deductible) in circumstances where there is no underlying coverage. See 4 New Appleman on Ins. L. Libr. Ed. § 24.02[3], at 24-17 (Dec. 2010).

Because Steadfast does not contend that any of the medical incidents for which Exeter seeks coverage would not have fallen within the coverage of the SIT, I agree with the majority that a reasonable interpretation of the umbrella policy is that Steadfast's liability for each such claim is not subject to the $100,000 retained limit after Exeter has exhausted its $4 million annual aggregate. I therefore concur specially in the judgment of the court.