Hillsborough-northern judicial district
No. 2014-285

TERRY ANN BARTLETT

v.

THE COMMERCE INSURANCE COMPANY & a.

Argued: February 19, 2015
Opinion Issued: April 3, 2015

*McDowell & Osburn, P.A.*, of Manchester (*Gordon A. Rehnborg, Jr.* on the brief and orally), for the petitioner.

*Morrison Mahoney, LLP*, of Boston, Massachusetts (*Kevin Truland* on the brief and orally), for respondent The Commerce Insurance Company.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Donald L. Smith* on the brief and orally), for respondent Foremost Insurance Company.

*Getman, Schulthess & Steere, P.A.*, of Manchester (*Naomi L. Getman* on the brief and orally), for respondent Progressive Northern Insurance Company.

DALIANIS, C.J. Respondent The Commerce Insurance Company (Commerce) appeals, and the petitioner, Terry Ann Bartlett, cross-appeals, an order of the Superior Court (*Garfunkel*, J.) partially granting and partially denying the petitioner's summary judgment motion, denying Commerce's cross-motion for summary judgment, and granting cross-motions for summary judgment filed by respondents Foremost Insurance Company (Foremost) and Progressive Northern Insurance Company (Progressive). We affirm in part, reverse in part, and remand.

The trial court recited the following facts. The petitioner was injured in a motor vehicle accident in New York in August 2004, when the motorcycle

on which she was a passenger, which Jeffrey Vilagos owned and operated, was struck by a motor vehicle operated by Myroslaw Mykijewycz. Mykijewycz is insured by Allstate Insurance Company (Allstate) under a policy that provides liability insurance coverage up to $100,000 per person. Vilagos's motorcycle, which is registered and garaged in New Jersey, is insured by Foremost. The Foremost policy was issued in New Jersey and provides uninsured/underinsured motorist (UIM) coverage up to $250,000 per person.

The petitioner also owns a motorcycle, which is registered and garaged in New Hampshire, and which is insured by Progressive under a policy that also provides UIM coverage up to $250,000 per person. The petitioner's other vehicles, which are both registered and garaged in New Hampshire, are insured by Commerce under a policy that provides UIM coverage up to $250,000 per person (the Commerce Auto policy). The petitioner's home is also insured by Commerce under a policy that contains a personal umbrella endorsement that provides $1,000,000 of single limited UIM coverage (the Commerce Umbrella policy).

In September 2004, the petitioner's New York attorney requested coverage information from Foremost, which Foremost provided. In April 2005, the petitioner's attorney informed Progressive and Commerce that the petitioner intended to pursue UIM claims.

On March 25, 2009, Allstate offered its policy limit ($100,000) to the petitioner. On March 27, the petitioner's attorney notified Foremost, Progressive, and Commerce of this fact and advised the insurers that, pursuant to New York law, they were "either required to grant [the petitioner] permission to collect" the $100,000 from the Allstate policy "or to pay [her] [that] amount within thirty (30) days." However, the New York law to which the attorney referred did not govern any of the insurers. Only Commerce responded to the petitioner's attorney, granting the petitioner permission to settle with Allstate. The petitioner released Allstate from liability on April 14. The release was delivered to Allstate on April 28, and, on July 2, the petitioner received $100,000 from Allstate.

The petitioner sued Foremost, Progressive, and Commerce in New York in January 2011, more than six years after the accident. That lawsuit was eventually dismissed. While the insurers' motions to dismiss were pending, the petitioner filed the instant petition for declaratory judgment. She moved, and the insurers cross-moved, for summary judgment.

In its order, the trial court first observed that the parties do not dispute that: (1) each insurance policy provides UIM coverage; (2) the accident and the petitioner's injuries fall within the UIM provisions of each policy; (3) Foremost is the primary insurer, Progressive and Commerce (through the Auto policy) are the "excess" or secondary insurers, and Commerce

(through the Umbrella policy) provides umbrella coverage; (4) if all policies are available to the petitioner, she must exhaust each layer of coverage before a subsequent layer of coverage is triggered; and (5) each insurer required to provide coverage is entitled to a credit to be determined according to the formula articulated in *Ellis v. Royal Insurance Co.*, 129 N.H. 326, 338-39 (1987).

The trial court then addressed the claims involving each insurer in turn. The court decided that the petitioner could not proceed against Foremost because her petition for declaratory judgment was untimely pursuant to the New Jersey statute of limitations for UIM claims, which, the court determined, applied. The court concluded that, even though Commerce was an excess insurer in this case, it was required to "drop down" and provide primary coverage to the petitioner (*e.g.*, provide coverage for her first $250,000 of damages). The court determined that Progressive, the other excess insurer, was not required to "drop down" to provide primary coverage. With regard to Progressive's obligation to provide excess insurance coverage, the trial court, in response to Progressive's motion for partial reconsideration, determined that the petitioner forfeited her coverage when she settled with Allstate without Progressive's prior consent. Finally, the court determined that Commerce, pursuant to the Umbrella policy, was required to provide coverage once the petitioner's damages exceed the limits of all underlying or primary coverage that is actually available.

In reviewing a trial court's summary judgment rulings, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Rivera v. Liberty Mut. Fire Ins. Co.*, 163 N.H. 603, 606 (2012). Summary judgment may be granted only when no genuine issue of material fact is present and the moving party is entitled to judgment as a matter of law. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

## I. Foremost

We first address whether the trial court erred when it determined that the petitioner's claim for UIM coverage under the Foremost policy was governed by the New Jersey statute of limitations for UIM claims. New Jersey has a six-year statute of limitations for UIM claims that begins to run from the date of the accident. *Price v. New Jersey Mfrs. Ins. Co.*, 867 A.2d 1181, 1184 (N.J. 2005). By contrast, in New Hampshire, the statute of limitations for UIM claims is three years, *see* RSA 508:4, I (2010), and runs from the date on which the insurer denies the UIM claim. *Metropolitan Prop. & Liabil. Ins. Co. v. Walker*, 136 N.H. 594, 596-98 (1993).

■ When New Hampshire is the forum for a suit in which one or more other states also have an interest, we first decide whether a relevant law is substantive or procedural. *Waterfield v. Meredith Corp.*, 161 N.H. 707, 710 (2011). If it is substantive, we determine whether it actually conflicts with the laws of another interested state and, if so, we then conduct an analysis based upon five choice-of-law influencing considerations. *Id.* If it is procedural, we generally apply our own law. *Id.*

■ In *Waterfield*, we held that we treat statutes of limitations as procedural "in any case in which either party is a New Hampshire resident or the cause of action arose in this State." *Id.* (quotation omitted). In a case in which no party is a New Hampshire resident and the cause of action did not arise in this state, we treat statutes of limitations as substantive. *See id.* at 713.

In this case, the parties do not assert that the cause of action arose in New Hampshire. Moreover, they do not assert that Foremost has ever been a New Hampshire resident. Accordingly, to decide whether to treat the statute of limitations as procedural or substantive, we must first determine whether the petitioner is a New Hampshire resident using New Hampshire law to decide this issue. *See id.* at 710; *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 13 (1971) ("In applying its rules of Conflict of Laws, the forum determines domicil according to its own standards.").

■ In *Waterfield*, we concluded that the controlling date for determining a party's residence for this purpose "is the date the cause of action arose." *Waterfield*, 161 N.H. at 712. Under New Hampshire law, UIM claims sound in contract and arise when there is a contractual breach. *Walker*, 136 N.H. at 597. Under New Hampshire law, an insurance policy is breached by an insurer when the insurer improperly denies the UIM claim. *Id.* at 597-98. Here, it is undisputed that Foremost formally denied the petitioner's claim on May 25, 2012. It is also undisputed that, on May 25, 2012, the petitioner was not a New Hampshire resident. Accordingly, because the petitioner was not a New Hampshire resident when Foremost formally denied her UIM claim, she is not a New Hampshire resident for the purposes of determining whether the statute of limitations in this case is procedural or substantive, and the trial court did not err by so finding. *See Waterfield*, 161 N.H. at 712.

■ Because neither the petitioner nor Foremost was a New Hampshire resident when the cause of action arose, and because the cause of action did not arise in this state, determining which state's statute of limitations applies requires balancing the traditional choice-of-law considerations. *See id.* at 713. As no party has challenged the trial court's analysis of those

considerations, we accept the trial court's analysis, uphold its determination that the New Jersey statute of limitations applies, and affirm its decision that the petitioner's UIM claim against Foremost is, therefore, time-barred.

The petitioner advances numerous arguments to urge us to reach a different result. We find them unpersuasive. For instance, although the petitioner acknowledges that, in *Waterfield*, we stated that the "controlling time" for determining residency for statute of limitations purposes "is the date the cause of action arose," *id.* at 712, she argues that if *Waterfield* is read "careful[ly]," it "makes . . . clear that the relevant date for determining the party's residence for statute of limitations purposes is the date the plaintiff has a [ripe] claim." Our language in *Waterfield* speaks for itself.

Similarly, despite *Walker*, the petitioner argues that her cause of action is a claim for a declaratory judgment, which, she asserts, arose in June 2010, when Foremost notified her that it had not yet completed its investigation. However, *Walker*, like this case, involved a declaratory judgment proceeding. *Walker*, 136 N.H. at 595. Even so, we held that the underlying claim in that case was a claim for UIM coverage under the insurance policy, just like the claim in this case. *Id.* at 596-97. Moreover, despite our holding in *Walker*, that UIM claims sound in contract and arise when the insurer denies coverage, *id.* at 597-98, the petitioner contends that such a claim "is functionally equivalent to a tort action," and, therefore, "arises simultaneously with the accident." We have reviewed the remainder of her arguments on this issue and conclude that they warrant no further discussion. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

## II. Progressive

We next consider whether the trial court erred when it concluded that the petitioner forfeited her right to excess coverage under the Progressive policy because she failed to obtain consent from Progressive before she settled with Allstate. The Progressive policy includes a consent-to-settle provision, which provides: "If recovery is made by an insured person under this policy from a responsible party or that party's insurer without our written consent, the insured person's right to payment under any affected coverage will no longer exist."

The trial court determined that the petitioner violated the consent-to-settle provision because she settled with Allstate without first obtaining Progressive's consent. Despite the petitioner's argument to the contrary, the trial court concluded that Progressive's silence in the approximately 90 days between March 27, 2009 (the date on which the petitioner informed

Progressive of her potential settlement with Allstate), and July 2, 2009 (the date on which the petitioner received the settlement proceeds), did not constitute an implied waiver of the consent-to-settle provision.

On appeal, the petitioner argues that, because Progressive did not respond to her March 27 letter and expressly convey its intent to deny her permission to settle "within some reasonable period of time," Progressive waived its right to rely upon the consent-to-settle provision. We disagree.

■■ Although the petitioner argues that Progressive has the burden of proving that its failure to respond to her March 27 letter was "reasonable," in fact, she has the burden of demonstrating that Progressive waived its right to rely upon the consent-to-settle provision. *See Gianola v. Continental Cas. Co.*, 149 N.H. 213, 214 (2003). To establish waiver, the petitioner must "show either explicit language" indicating Progressive's "intent to forego a known right, or conduct from which it [could] be inferred" that Progressive intended to abandon that right. *Id.* In the insurance context, "[t]he substance of the doctrine of waiver is that[,] if the insurer, with knowledge of the facts which would bar an existing primary liability, recognizes such primary liability by treating the policy as in force, it will not thereafter be allowed to plead such facts to avoid its primary liability." *Id.* (quotation and brackets omitted). "Thus, an implied waiver must be predicated upon acts or conduct of the insurer, after knowledge of a breach, tending to show a recognition of the validity of the policy, and an intent to relinquish the right to avoid it for the known breach." *Id.* (quotation, ellipsis, and emphasis omitted). Examples of conduct tending to show that the insurer recognizes the validity of the policy include investigating the insured's claim or responding to the insured's claim request by disclaiming coverage based upon a specific defense. *Id.* at 214-15. Waiver is a question of fact, and we will not overturn the trial court's determination unless it is clearly erroneous. *So. Willow Properties v. Burlington Coat Factory of N.H.*, 159 N.H. 494, 499 (2009).

■ Here, the trial court's finding is not clearly erroneous. Like the insurer in *Gianola*, Progressive took no action "in recognition of the policy" before the settlement was reached. *Gianola*, 149 N.H. at 215. Progressive "simply failed to respond" to the petitioner's March 27 letter. *Id.* Even if we assume, as the petitioner argues, that the consent-to-settle provision required Progressive to respond to her March 27 letter, Progressive's failure to do so does not constitute an implied waiver. *See id.* As we explained in *Gianola*, in which the insured argued that the insurer was required by regulation to respond to notice of his claim, "[w]e are not persuaded by the . . . argument that the [insurer's] silence, despite its legal obligation to speak . . . , is sufficient to establish waiver." *Id.* (quotation

omitted). Progressive's silence with regard to the petitioner's March 27 letter does not constitute conduct that either treats the policy as if it were in force or evinces intent to relinquish Progressive's right to rely upon the consent-to-settle provision. *See id.* Accordingly, because we reject the petitioner's assertion that Progressive waived its right to rely upon the consent-to-settle provision, we uphold the trial court's determination that she forfeited her right to excess coverage under the Progressive policy.

*III. Commerce*

We next address whether the trial court erroneously determined that, pursuant to the "other insurance" provision of the UIM part of the Commerce Auto policy, Commerce is obligated to "drop down" to provide primary UIM coverage to the petitioner.

The other insurance clause at issue provides, in pertinent part:

> If there is *other applicable insurance available* under one or more policies or provisions of coverage that is similar to the insurance provided under this Part of the policy:
>
> . . . .
>
> 2. *Any insurance we provide* with respect to a vehicle you do not own *shall be excess over any collectible insurance* providing such coverage on a primary basis.
>
> 3. If the coverage under this policy is provided:
>
>> a. On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on a primary basis.
>>
>> b. On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage provided on an excess basis.

(Emphases added.) The New Hampshire UIM coverage endorsement adds the following: "With respect to 'property damage', this insurance shall

apply only after the limits of *any other collectible insurance* applicable to the damaged property have been exhausted." (Emphasis added.)

Pursuant to the plain meaning of the other insurance clause, because the petitioner was injured while riding a motorcycle that she did not own, any coverage provided by Commerce was considered to be excess coverage. Indeed, the parties do not dispute that the primary insurance policy belongs to Foremost and that the Commerce Auto policy is a secondary policy, providing coverage that is excess to that provided by Foremost.

Relying upon the other insurance clause, however, the petitioner argues that Commerce must "drop down" to provide primary coverage because primary coverage under the Foremost policy is neither "available" nor "collectible." To the petitioner, the words "available" and "collectible" are ambiguous and, therefore, because we must interpret them strictly against the insurer and in favor of the insured, *see Trombly v. Blue Cross/Blue Shield*, 120 N.H. 764, 771 (1980), they mean "actually available" and "actually collectible." *See Benzer v. Iowa Mutual Tornado Insurance Ass'n*, 216 N.W.2d 385, 390-91 (Iowa 1974). Thus, she reasons, because primary coverage is neither "actually available" nor "actually collectible" from Foremost, the trial court correctly decided that Commerce must "drop down" and provide her with primary UIM coverage (*e.g.*, provide coverage for her first $250,000 worth of damages). *See id.*

Commerce appears to agree that the terms create an ambiguity in the other insurance clause, but contends that we must interpret them to mean "reasonably available" and "reasonably collectible." *See Hoffman v. United Services Auto. Ass'n*, 671 F. Supp. 922, 925 (D. Conn. 1987). Commerce contends that coverage under the Foremost policy was, in fact, "available" and "collectible," and that the petitioner's unreasonable failure to effectuate her claim for coverage, does not render such coverage "unavailable" and "uncollectible." Thus, Commerce argues, because primary coverage under the Foremost policy is available and collectible within the meaning of the other insurance clause, Commerce remains an excess insurer and need only provide coverage after the petitioner's damages exceed $250,000 (the limit under the Foremost policy).

█ The interpretation of insurance policy language is a question of law for this court to decide. *White v. Vt. Mut. Ins. Co.*, 167 N.H. 153, 156 (2014). "The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties." *Bates v. Phenix Mut. Fire Ins. Co.*, 156 N.H. 719, 722 (2008). To discern the parties' intent, we first examine the language of the contract itself. *Id.* In interpreting policy language, we look to the plain and ordinary meaning of the policy's words in context. *White*, 167 N.H. at 157. We construe the terms

of the policy as would a reasonable person in the position of the insured based upon more than a casual reading of the policy as a whole. *Id.* Policy terms are construed objectively, and where the terms of a policy are clear and unambiguous, we accord the language its natural and ordinary meaning. *Id.* We need not examine the parties' reasonable expectations of coverage when a policy is clear and unambiguous; absent ambiguity, our search for the parties' intent is limited to the words of the policy. *Id.* The fact that the parties may disagree on the interpretation of a term or clause in an insurance policy does not necessarily create an ambiguity. *See Bates*, 156 N.H. at 722. For an ambiguity to exist, the disagreement must be *reasonable. See White*, 167 N.H. at 157; *see also Colony Ins. Co. v. Dover Indoor Climbing Gym*, 158 N.H. 628, 630 (2009).

"In determining whether an ambiguity exists, we will look to the claimed ambiguity, consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." *Colony Ins. Co.*, 158 N.H. at 630. "If one of the reasonable meanings of the language favors the policyholder, the ambiguity will be construed against the insurer," *id.*, in order to honor the insured's reasonable expectations, *Great Am. Ins. Co. v. Christy*, 164 N.H. 196, 203 (2012). However, when "the policy language is clear, this court will not perform amazing feats of linguistic gymnastics to find a purported ambiguity simply to construe the policy against the insurer and create coverage where it is clear that none was intended." *Colony Ins. Co.*, 158 N.H. at 630-31 (quotation omitted).

In the context of UIM coverage specifically, when construing clauses that are similar to that at issue, jurisdictions are divided as to whether the language in such clauses is ambiguous. *Compare Garcia v. Rivera*, 879 F. Supp. 170, 172 (D.P.R. 1995) (clause providing that for any covered auto that insured did not own, insurance under policy "is excess over any other collectible insurance" is not ambiguous), *and Vrabel-Kilby v. Nationwide Mut. Ins. Co.*, No. 4-11-0965, 2012 WL 7037596, at *6-7 (Ill. App. Ct. June 27, 2012) (clause providing, in pertinent part, that if "there is other insurance for bodily injury suffered by an insured while occupying a motor vehicle" other than one the insured owns, insurer's coverage "is excess over any other collectible . . . insurance" is unambiguous), *with Hoffman*, 671 F. Supp. at 924 (policy providing that, with regard to bodily injury sustained while occupying a vehicle that insured did not own, insurance applied "only as excess insurance over any other similar insurance available to such insured and applicable to such vehicle[s] as primary insurance" is ambiguous because the word "available" could mean anything) (emphasis omitted), *Benzer*, 216 N.W.2d at 387-88 (same), *and Narron v. Cincinnati Ins. Co.*, 97 P.3d 1042, 1046, 1048 (Kan. 2004) (clause providing that any insurance

provided with regard to vehicle not owned by insured "shall be excess over any other collectible insurance" is ambiguous).

In *Garcia*, for instance, the court had to determine the extent of the liability of the excess insurer, National Union Fire Insurance Company (National Union), in light of the insolvency of the primary insurer, Corporación Insular de Seguros. *Garcia*, 879 F. Supp. at 170-71. National Union's policy included an excess clause similar to the one at issue in this case that provided: "For any covered auto you own this policy provides primary insurance. For any covered auto that you don't own the insurance provided by this policy is excess over any other collectible insurance." *Id.* at 172 (quotation omitted). The court concluded that the phrase "any other collectible insurance" was not ambiguous. *Id.* The court determined that National Union's liability under its "other insurance" clause "does not attach to National Union unless and until the underlying insurer . . . has paid or has been held liable to pay its insurance coverage limits." *Id.* The court held that, when the primary insurer is insolvent, the excess insurer does not drop down to act as the primary insurer. *Id.* The court observed that an excess insurer "assumes a smaller risk than does a primary carrier," and that to require National Union to drop down to provide primary coverage would "place a risk on National Union which it had never agreed to assume." *Id.* at 172, 173.

Other courts have found the terms "available" and "collectible" to create ambiguity. As one court explained with regard to the word "available," that word "could mean anything from 'in hand' or 'actually received' to 'within reach' or 'conceivably obtainable.' " *Hoffman*, 671 F. Supp. at 924.

Courts that have found the terms ambiguous are divided as to how best to interpret them. For instance, although the court in *Hoffman* found the use of the word "available" in an excess escape clause to be ambiguous, it decided that it would not construe the word "strictly" against the insurer to mean "actually available." *Id.* at 925. Instead, the court concluded:

> The seemingly better and more reasoned approach would be to construe "available" to mean that which is reasonably available, *viz*, available with a reasonable effort, passage of time, or occurrence of events. Had the parties intended [the word to mean actually available], the words "recovered" or "received in hand" would have been used. The word "available," however, permits, and dictates, that the reference was to funds which were obtainable or within the legal reach of the insured. Construing the term in this manner allows the interest of both the insured and the insurer to be protected. The purpose of excess coverage is to provide additional coverage when the coverage provided by the primary policies does not fully compensate an insured for his loss.

Obviously, this purpose is emasculated if the insured can bypass the coverage provided by the primary carrier and seek relief from the excess carrier or if the primary carrier is allowed to circumvent its obligations by settling with the victim for less than his full damages, without exhausting its coverage, only to pass the burden of the remainder of the full damages to the excess carrier. The word "excess" loses its meaning under either scenario. Thus, by construing the word "available" to mean that which is reasonably available ensures that the excess insurer's expectations are protected, i.e., that its coverage will truly be excess. On the other hand, the insured expected excess coverage and that expectation is protected by requiring him only to do that which is reasonable. The insured's protection is preserved in the excess carrier's recited coverage which is available after other available coverage is exhausted. His protection is lost only to the extent he waives or fails unreasonably to effectuate a claim to the primary coverage. An insured is thus required to do only what is reasonable to obtain the available, primary coverage. If, after reasonable efforts, there is no other coverage available, then the excess coverage can be tapped as was clearly what both parties could and should have contemplated.

*Id.* (citation omitted). The court determined that the plaintiff in that case failed to act reasonably because he failed to seek UIM coverage under the primary insurance policy. *Id.* at 925-26. Thus, the court reduced the UIM coverage the plaintiff sought under the excess insurance policy by the amount of the additional coverage that would have been available to him under the primary insurance policy. *Id.* at 926.

By contrast, the court in *Benzer* concluded that the word "available," as used in an excess escape clause, was ambiguous and meant actually, not theoretically, available. *Benzer,* 216 N.W.2d at 391. The court reasoned that, when construing the language "with the broad protective design of the legislature" in mind, it "permits the [excess insurer] to avoid paying . . . damages only to the extent those damages were in fact paid by 'other (primary) insurance.'" *Id.*; *see Toney v. Shelter Mut. Ins. Co.,* No. CA 88-305, 1989 WL 72285, at *1-3 (Ark. Ct. App. June 28, 1989) (construing excess escape clause and deciding that the word "available" means "actually available," in light of the purpose of uninsured motorist coverage, which is "to protect the insured from financially irresponsible motorists").

■ We are persuaded that, as used in the "other insurance" clause at issue, the words "available" and "collectible" do not create an ambiguity. We find the decision in *Vrabel-Kilby* instructive. The facts of *Vrabel-Kilby* are

similar to those in this case. As in the instant case, there were three potential insurers on the risk: (1) AAA Chicago Motor Club, a/k/a Memberselect (AAA), the insurer of the vehicle in which the plaintiff was injured, which the plaintiff did not own; (2) Nationwide Mutual Insurance Company (Nationwide), the plaintiff's insurer; and (3) Viking Insurance Company (Viking), the insurer of the vehicle that caused the accident. *Vrabel-Kilby*, 2012 WL 7037596, at *1. Like the petitioner in this case, the plaintiff in *Vrabel-Kilby* did not make a UIM claim with the primary insurer (AAA). *Id.* Moreover, although the AAA policy required the plaintiff to notify the insurer in case of a settlement, the plaintiff failed to do so when she settled with Viking. *Id.* Nationwide, like Commerce in this case, denied coverage based upon its "other insurance" clause which provided, similarly to the Commerce Auto "other insurance" clause, that if the insured is injured while in a motor vehicle other than her own, the insurer's coverage "is excess over any other collectible . . . insurance." *Id.* at *2, *6, *7 (quotation omitted).

The court in *Vrabel-Kilby* first concluded that the "other insurance" clause was unambiguous. *Id.* at *7. The court held that the clause, interpreted according to its plain meaning, "clearly informs an insured if she is injured in another person's vehicle, she first must recover from other collectible insurance . . . before she can collect anything from Nationwide." *Id.*

The court then determined that the plaintiff forfeited her right to pursue her UIM claim against AAA by failing to notify AAA of her potential settlement with Viking. *Id.* at *8. The court further concluded that, even though she forfeited her right to pursue her UIM claim against AAA, the AAA policy's UIM coverage constituted "other collectible insurance" within the meaning of the "other insurance" clause of the Nationwide policy. *Id.* The court explained that, when the "plaintiff filed her claim with Nationwide, other collectible insurance existed, *i.e.*, AAA's underinsured motorist coverage." *Id.* The court decided that, because the plaintiff "failed to satisfy the requirements for coverage under the AAA policy[,] . . . coverage under the Nationwide policy was not implicated." *Id.*

Like the court in *Vrabel-Kilby*, we conclude that the other insurance clause in the UIM part of the Commerce Auto policy "clearly informs an insured if she is injured in another person's vehicle, she first must recover from other collectible insurance . . . before she can collect . . . from [Commerce Auto]." *Id.* at *7. In the context of this case, the petitioner's construction of the terms to mean "actually available" and "actually collectible" is not a reasonable interpretation of the policy. A reasonable person in the position of the petitioner could not have understood that coverage under the Foremost policy would be "unavailable" and

"uncollectible" merely because she forfeited her right to recover under that policy. The petitioner's construction would eviscerate the purpose of an excess insurance clause, which is "to provide *additional* coverage when the coverage provided by the primary policies does not fully compensate an insured for his loss." *Hoffman*, 671 F. Supp. at 925 (emphasis added). That purpose would be rendered meaningless "if the insured can bypass the coverage provided by the primary carrier and seek relief from the excess carrier." *Id.* Had the parties intended the words "available" and "collectible" to mean "actually available" and "actually collectible," they would have used different words, such as "collected," "recovered," or "received in hand." *See id.*

Like the plaintiff in *Vrabel-Kilby*, the petitioner forfeited her right to coverage under the primary insurance policy (here, Foremost). *Vrabel-Kilby*, 2012 WL 7037596, at *8. However, just as coverage under the primary policy was available and collectible in *Vrabel-Kilby*, *id.* at *7, so too coverage under the Foremost policy was "available" and "collectible" in this case. In *Vrabel-Kilby*, the only reason that the plaintiff was not entitled to coverage under the primary policy was because she did not comply with the policy's terms. *Id.* at *8. Similarly, here, the only reason that the petitioner is not entitled to coverage under the Foremost policy is because she failed to bring her claim within six years of the accident. Like the court in *Vrabel-Kilby*, we hold that, because the petitioner forfeited her right to pursue her UIM claim against the primary insurer (here, Foremost), the primary insurance policy's UIM coverage constitutes "available" and "collectible" insurance within the meaning of the "other insurance" clause. *See id.* Accordingly, we reverse the trial court's contrary determination and its conclusion that Commerce is required to "drop down" and provide primary coverage. Thus, because Commerce continues as an excess insurer, it has no obligation to pay UIM benefits under the Commerce Auto policy until the petitioner's damages exceed $250,000.

Although Commerce contends that, even though the petitioner forfeited her rights under the Progressive policy, "the available coverage under the Commerce [A]uto policy . . . will apply proportionately with the coverage that would have been available to [her] under the Progressive policy had she not forfeited her rights to coverage," we decline to decide this issue in the first instance. We similarly decline to decide when coverage under the Commerce Umbrella policy is triggered, despite Commerce's assertion that it is not triggered until after the petitioner has exhausted the limits under the Commerce Auto policy and the limits that would have been available under the Foremost and Progressive policies. Commerce may make these arguments, on remand, in the trial court.

*IV. Conclusion*

To summarize, we affirm the trial court's determination that the petitioner forfeited her right to recover primary insurance coverage under the Foremost policy and her right to recover excess insurance coverage under the Progressive policy and reverse its conclusion that Commerce must "drop down" to provide primary coverage. We remand for further proceedings consistent with this opinion.

*Affirmed in part; reversed in part; and remanded.*

CONBOY, LYNN, and BASSETT, JJ., concurred.