NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2016-0540


MICHELLE RUSSELL & a.

v.

NGM INSURANCE COMPANY

Argued:  May 16, 2017
Opinion Issued:  November 15, 2017

Law Office of John S. Wessler, of Lawrence, Massachusetts (John S. Wessler on the brief and orally), for the plaintiffs.

Getman, Schulthess, Steere & Poulin, P.A., of Manchester (Elizabeth L. Hurley on the brief and orally), for the defendant.

DALIANIS, C.J.  The plaintiffs, Michelle and Robert Russell (homeowners), appeal an order of the Superior Court (Anderson, J.) denying their summary judgment motion and granting that of the defendant, NGM Insurance Company (insurer).  On appeal, the homeowners contend that the trial court erred when it determined that their homeowners' insurance policy provided no coverage for the additional living expenses they incurred when they were unable to live in their home because of mold contamination.  We affirm.

I.  Facts

The following facts are derived either from the trial court's order or the record submitted on appeal.  The insured residence is a custom home in Windham, built in 2007.  In early 2015, the homeowners discovered mold and moisture in the home's attic, which were the result of faulty workmanship.  As a result of the mold, they vacated the home in March 2015 so that the mold could be eradicated.  They moved back into the home in May 2016.

In October 2015, the homeowners submitted a claim to the insurer for loss of use damages under Coverage D of their homeowners' policy.  There is no evidence in the record that they also submitted a claim to the insurer for mold eradication.  The insurer denied the loss of use claim in November 2015.  The denial letter explained that, pursuant to the "Limited Fungi, Wet or Dry Rot, or Bacteria" endorsement to the homeowners' policy (Mold Endorsement), "[m]old is covered only if caused by a Peril Insured Against," and, here, because the mold was caused by faulty workmanship, which is an excluded peril, there is no coverage.

Thereafter, the homeowners brought a petition for declaratory judgment, seeking a declaration that they are entitled to loss of use damages under Coverage D.  In their petition, they alleged that their loss of use damages were not subject to the faulty workmanship exclusion because mold constitutes an ensuing loss of the faulty workmanship that was not otherwise excluded under the policy.

Both the homeowners and the insurer moved for summary judgment.  The trial court granted the summary judgment motion of the insurer and denied that of the homeowners.  The homeowners unsuccessfully moved for reconsideration, and this appeal followed.

II.  Discussion

A.  Standards of Review

In reviewing a trial court's rulings on cross-motions for summary judgment, we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law.  JMJ Properties, LLC v. Town of Auburn, 168 N.H. 127, 129 (2015).  "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment."  Id. at 129-30 (quotation omitted).  We review the trial court's application of the law to the facts de novo.  Brown v. Concord Group Ins. Co., 163 N.H. 522, 524-25 (2012).

"In a declaratory judgment action to determine the coverage of an insurance policy, the burden of proof is always on the insurer, regardless of which party brings the petition." Cogswell Farm Condo. Ass'n v. Tower Group, Inc., 167 N.H. 245, 248 (2015) (quotation omitted). We interpret insurance policy language de novo. See id. "The fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties." Bartlett v. Commerce Ins. Co., 167 N.H. 521, 530 (2015) (quotation omitted). To discern the parties' intent, we begin by examining the insurance policy language. Id. In interpreting policy language, we look to the plain and ordinary meaning of the policy's words in context. Id. We construe the terms of the policy as would a reasonable person in the position of the insured based upon more than a casual reading of the policy as a whole. Id. at 530-31. This is an objective standard. Great Am. Dining v. Philadelphia Indem. Ins. Co., 164 N.H. 612, 616 (2013).

Insurers are free to contractually limit the extent of their liability through use of a policy exclusion provided it violates no statutory provision. Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co., 151 N.H. 649, 653 (2005). "Such language must be so clear, however, as to create no ambiguity that might affect the insured's reasonable expectations." Id. (quotation omitted). The insurer asserting an exclusion of coverage bears the burden of proving that the exclusion applies. Id.

"We need not examine the parties' reasonable expectations of coverage when a policy is clear and unambiguous; absent ambiguity, our search for the parties' intent is limited to the words of the policy." Bartlett, 167 N.H. at 531. "The fact that the parties may disagree on the interpretation of a term or clause in an insurance policy does not necessarily create an ambiguity." Id. "For an ambiguity to exist, the disagreement must be reasonable." Id.

"In determining whether an ambiguity exists, we will look to the claimed ambiguity, consider it in its appropriate context, and construe the words used according to their plain, ordinary, and popular definitions." Id. (quotation omitted). "If one of the reasonable meanings of the language favors the policyholder, the ambiguity will be construed against the insurer, in order to honor the insured's reasonable expectations." Id. (quotation and citation omitted). "However, when the policy language is clear, this court will not perform amazing feats of linguistic gymnastics to find a purported ambiguity simply to construe the policy against the insurer and create coverage where it is clear that none was intended." Id. (quotation omitted).

3

B.  The Policy

The homeowners' insurance policy consists of a base policy modified by endorsements that include the Mold Endorsement and the "Platinum Homeowner Endorsement – New Hampshire" (New Hampshire Endorsement). (Bolding and capitalization omitted.)  The policy is an "all risk" policy that insures "against risk of direct loss" to the homeowners' dwelling, other structures on the residence property, and personal property, if the loss "is a physical loss to property."  See Michael C. Phillips & Lisa L. Coplen, Concurrent Causation Versus Efficient Proximate Cause in First-Party Property Insurance Coverage Analysis, 36 The Brief 32, 33 (Winter 2007) (explaining that "[t]he typical 'all risks' policy begins with a broad insuring provision that states that the policy covers 'direct physical loss or damages to covered property'" and "then specifies which risks [the insurer] will not assume by listing those causes of loss as policy exclusions").  "An 'all risk' policy typically covers any risk of direct physical loss or damage that is not specifically excluded or limited by the terms of the policy."  Caryn L. Daum, A Primer on New Hampshire First-Party Property Insurance, 52 N.H.B.J. 20, 21 (Autumn 2011).  For the purposes of this appeal, there is no dispute that the loss for which the homeowners seek coverage constitutes a direct, physical loss to the property.

The policy is divided into two sections:  "Section I," which pertains to property coverages, and "Section II," which pertains to liability coverages. (Bolding and capitalization omitted.)  The instant case concerns only Section I.

Section I of the broad form policy has four components:  "Property Coverages," "Perils Insured Against," "Exclusions," and "Conditions." (Bolding and capitalization omitted.)  As relevant to this appeal, the New Hampshire Endorsement modifies within Section I "Perils Insured Against" and "Exclusions."  (Bolding and capitalization omitted.)

"Property Coverages" specifies that coverage is available for:  (1) the homeowners' dwelling on the "residence premises," structures attached to the dwelling, and materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises" (Coverage A); (2) certain additional structures on the "residence premises" (Coverage B); (3) personal property (Coverage C); (4) loss of use (Coverage D); and (5) certain enumerated "Additional Coverages," such as coverage for "Debris Removal" and "Reasonable Repairs."  (Bolding, quotations, and capitalization omitted.)  The policy defines the "[r]esidence premises" as the building in which the insured resides, whether that building is a one-family dwelling or a two-family dwelling or some other structure or building.  (Quotation omitted.)  The homeowners concede that Coverages B and C are not at issue.

The homeowners' claim is under Coverage D for loss of use.  Coverage D provides, in pertinent part, that "[i]f a loss covered under this Section makes that part of the 'residence premises' where you reside not fit to live in, we cover . . . Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living."  (Bolding omitted.)  For the purposes of this appeal, there is no dispute that the expenses submitted by the homeowners constitute Additional Living Expenses under the policy.

In referring to "a loss covered under this Section," Coverage D incorporates, by reference, the requirements for Coverages A, B, C, and Additional Coverages.  See Mellin v. N. Sec. Ins. Co., 167 N.H. 544, 556-57 (2015) (interpreting similar insurance policy language).  In other words, because Coverage D is in the same section of the policy as Coverages A, B, C, and Additional Coverages, an insured is entitled to coverage under Coverage D if the insured's losses are covered under Coverages A, B, C, or Additional Coverages.  See id. at 557.  In the instant case, because the homeowners contend that their dwelling is uninhabitable, they are entitled to coverage under Coverage D if their loss is covered under Coverage A.

As modified by the New Hampshire Endorsement, the policy states that the insurer does not insure for losses caused by several specifically identified perils, including "[s]mog, rust or other corrosion, mold, wet or dry rot."

Also as modified by the New Hampshire Endorsement, at the end of "Perils Insured Against" is the following language:  "Under [the paragraphs specifying excluded perils], any ensuing loss to property described in Coverages A, B and C not excluded or excepted in this policy is covered."  (Bolding and capitalization omitted.)  This language constitutes an "ensuing loss" provision. See Paul T. Sullivan & Jeffrey A. Gordon, A Review of Ensuing Loss Case Law: 2010 to Present, 43 The Brief 18, 19 & n.1 (Spring 2014).  "Ensuing or resulting loss provisions in an 'all risk' property insurance policy provide an exception to coverage exclusions when an excluded peril in the chain of events results in damage to covered property."  Id. at 19 (footnote omitted).  "Ensuing loss provisions were developed in response to property insurance coverage issues arising from the San Francisco earthquake and fire in 1906."  Id. (footnote omitted).  "The San Francisco earthquake ruptured gas mains, which in turn sparked massive fires that burned across the city for three days, causing even greater damage than the earthquake itself."  Id.  "Insurers unsuccessfully argued that, because the earthquake started the causal chain that resulted in all the fire damage, the earthquake exclusion applied to bar coverage for fire damage as well."  Id. (footnote omitted).  "Following the disaster, the industry developed ensuing loss provisions in an effort to clarify

5

the scope of coverage where an excluded peril is a link in the chain of property damage causation." Id.

Under an ensuing loss clause, "when an excluded cause of loss, such as an earthquake or earth movement, brings about a covered cause of loss, such as fire, a property insurance policy may cover the ensuing loss." James S. Harrington, Lessons of the San Francisco Earthquake of 1906:  Understanding Ensuing Loss in Property Insurance, 37 The Brief 28, 28 (Summer 2008).  "The 1906 San Francisco earthquake has become the classic ensuing loss paradigm because fire (a covered peril) followed and arose from earthquake (not a covered peril)." Id.  "Property insurance covered the ensuing fire damage, but not the earthquake damage, because fire was a covered cause of loss and earthquake was not." Id. (footnote omitted).

As modified by the New Hampshire Endorsement, the insurance policy also states that the insurer does not insure for losses "[e]xcluded under . . . Exclusions." (Capitalization omitted.)  "Exclusions" consists of two paragraphs, numbered "1." and "2."  (Bolding and capitalization omitted.)  Paragraph "1." begins:  "We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss."  (Bolding omitted.)  The language of the second quoted sentence constitutes an "anti-concurrent causation" provision.  See Annotation, Validity, Construction, and Application of Anticoncurrent Causation (ACC) Clauses in Insurance Policies, 37 A.L.R.6th 657, 668 (2008).  "An anticoncurrent causation clause . . . states that where a property loss is caused by a combination of excluded and covered perils, the entire loss is excluded from coverage." Id.  Such a provision "has the effect of precluding coverage for damage that was caused by any of the [excluded perils] listed, to which the [anti-concurrent causation] clause applies, regardless of whether the damage may have also been caused, in some way, by a covered cause of loss." Daum, supra at 21; see Boazova v. Safety Ins. Co., 968 N.E.2d 385, 393 (Mass. 2012); see also Bates v. Phenix Mut. Fire Ins. Co., 156 N.H. 719, 723 (2008) (enforcing an anti-concurrent causation clause over the insured's objection).

Paragraph "2." of "Exclusions" begins:  "We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered."  (Bolding omitted.)  This, too, constitutes an "ensuing loss" clause.  See Sullivan & Gordon, supra at 19 & n.1.  Among the exclusions listed in paragraph "2." of "Exclusions" is an exclusion for losses "to property described in Coverage[ ] A . . . caused by . . . [f]aulty, inadequate or defective . . . workmanship."  (Bolding and capitalization omitted.)

6

The Mold Endorsement modifies the policy in the following relevant ways: First, it adds to the "Additional Coverages" section coverage for "'Fungi', Wet or Dry Rot, or Bacteria" and defines "'Fungi'" to mean "any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or byproducts produced or released by fungi." (Bolding and capitalization omitted.) There is no dispute that the mold at issue in this case falls within the policy's definition of "Fungi."

The additional coverage added by the Mold Endorsement includes, subject to certain limitations of liability, recovery of:

> (1) [t]he total of all loss payable under Section I – Property Coverages caused by 'fungi', wet or dry rot, or bacteria;
>
> (2) [t]he cost to remove 'fungi', wet or dry rot, or bacteria . . . ;
>
> (3) [t]he cost to tear out and replace any part of the building . . . as needed to gain access to the 'fungi', wet or dry rot, or bacteria; and
>
> (4) [t]he cost of testing of air or property to confirm the absence, presence or level of the 'fungi', wet or dry rot, or bacteria . . . .

(Bolding omitted.)

Second, the Mold Endorsement states that such additional coverage "only applies when [the] loss or costs are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred." For the purposes of this appeal, there is no dispute that the homeowners used "all reasonable means" to save and preserve their home as required by this provision.

Third, the Mold Endorsement deletes the reference to "mold, wet or dry rot" in the exclusion for "[s]mog, rust or other corrosion" and adds the following as an excluded peril:

> Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to all "insureds" and

7

is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

Fourth, the Mold Endorsement adds the following exclusion to paragraph "1." of "Exclusions":

> i.  "Fungi", Wet or Dry Rot, or Bacteria
>
> "Fungi", Wet or Dry Rot, or Bacteria meaning the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.
>
> This exclusion does not apply:
>
> (1)  When "fungi", wet or dry rot, or bacteria results from fire or lightning; or
>
> (2)  To the extent coverage is provided for in the "Fungi", Wet or Dry Rot, or Bacteria Additional Coverage under Section I – Property Coverages with respect to loss caused by a Peril Insured Against other than fire or lightning.
>
> Direct loss by a Peril Insured Against resulting from "fungi", wet or dry rot, or bacteria is covered.

(Bolding and capitalization omitted.)

C.  Coverage

The homeowners first argue that they have coverage for their loss of use damages because their damages constitute "ensuing losses" of faulty workmanship.  They contend that hidden and unknown accumulation of moisture is an ensuing loss of faulty workmanship, that it led to the mold, and that the mold led to mold contamination, illness, and, ultimately, loss of use. The homeowners' reliance upon the policy's ensuing loss clauses is misplaced.

"[C]ourts generally agree . . . that when a workmanship exclusion is triggered, an ensuing loss clause applies only when there is significant attenuation between the direct result of a workmanship defect and the ultimate loss for which coverage is sought, usually due to an independent or fortuitous intervening cause." Taja Investments LLC v. Peerless Insurance Company, No. 16-1854, 2017 WL 4534788, at *2 (4th Cir. Oct. 11, 2017) (applying Virginia law); see Weeks v. Co-Operative Ins. Cos., 149 N.H. 174, 177 (2003) (explaining that, under New Hampshire law, an ensuing loss provision applies when there is a peril that causes a loss or injury that is "separate and independent but

8

resulting from the original excluded peril, and this new peril is not an excluded one, from which loss ensues" (quotation omitted)); see also Prudential Property & Casualty Ins. Co. v. Lillard-Roberts, No. CV–01–1362–ST., 2002 WL 31495830, at *20 (D. Or. June 18, 2002) ("An ensuing loss requires an unexpected loss due to an intervening or contributing cause other than the mere passage of time." (applying Oregon law)).

"In other words, an ensuing loss provision excludes from coverage the normal results of defective construction, and applies only to distinct, separable, and ensuing losses." Taja Investments LLC, 2017 WL 4534788, at *2 (quotation omitted); see Friedberg v. Chubb & Son, Inc., 691 F.3d 948, 953 (8th Cir. 2012) (applying Minnesota law); see also Alton Ochsner Medical v. Allendale Mut. Ins. Co., 219 F.3d 501, 507 (5th Cir. 2000) (resulting loss clause generally applies only to damage that "result[s] fortuitously from events extraneous to the construction process" (quotation omitted) (applying Louisiana law)); In Re Chinese Manufactured Drywall Products Liab., 759 F. Supp. 2d 822, 850 (E.D. La. 2010) (reasoning that ensuing loss clause does not apply to damages that are a direct and continuous result of workmanship defect (applying Louisiana law)). To be covered under an ensuing loss provision, "the damage that falls under the exclusion and the ensuing damage must be separable events in that the damage and the ensuing loss must be different in kind, not just degree." In Re Chinese Manufactured Drywall Products Liab., 759 F. Supp. 2d at 850 (quotation omitted); see id. at 850-51 (concluding that odors emitted by drywall did not constitute ensuing losses from the drywall because they "are inseparable from the drywall and are a continuous result of the drywall").

Courts interpret ensuing loss clauses in this way so as to "assure that the exception does not supersede the exclusion by disallowing coverage for ensuing loss directly related to the original excluded risk." Vermont Elec. Power v. Hartford Steam Boiler Insp., 72 F. Supp. 2d 441, 445 (D. Vt. 1999) (quotation omitted). Such an interpretation is consistent with the original purpose of ensuing loss provisions, which "has been and remains to preserve coverage for insured losses, such as the fires after the San Francisco earthquake, and not to create a 'grant-back' through which coverage may be had for the original excluded loss, whether it be an earthquake, a design defect, or any other excluded cause of loss." Harrington, supra at 32 (footnote omitted); see Weeks, 149 N.H. at 177-78 (concluding that it is "not reasonable" to interpret the ensuing loss provision to apply to "any damage caused by faulty workmanship" because such an interpretation "contravenes the explicit language of the policy and renders the negligent work exclusion meaningless"); see also In Re Chinese Manufactured Drywall Products Liab., 759 F. Supp. 2d at 849, 850-51 (rejecting the plaintiffs' "claim that although a loss may be excluded from the [insurance] policies, the ensuing loss provisions are 'Lazarus-like,' resurrecting coverage for the excluded losses").

We are not persuaded by the homeowners' attempts to characterize the events that followed the faulty workmanship in this case as "ensuing losses." In that regard, we find TMW Enterprises instructive. See TMW Enterprises, Inc. v. Federal Ins. Co., 619 F.3d 574 (6th Cir. 2010). In that case, decided under Michigan law, the insurance policy, like the policy in this case, was an "all-risk policy" that covered "any direct physical loss or damage to the property unless caused by or resulting from an excluded peril." Id. at 575 (quotations omitted). As in this case, faulty workmanship was among the policy exclusions. Id. Similarly, as in this case, the faulty workmanship exclusion included an ensuing loss clause. Id.

The building in TMW Enterprises, like the home in the instant case, had been improperly constructed. Id. The construction defects in the TMW Enterprises building made it "vulnerable to water infiltration," and, without repair, the building "faced potential mold growth." Id. (quotation omitted). Similarly, the construction defects in the instant case led to moisture and mold. The insurer in TMW Enterprises, like the insurer here, denied coverage based upon the faulty workmanship exclusion. Id.

The insured in TMW Enterprises argued that, although faulty workmanship may have allowed water to seep into the building, the intruding water, nevertheless, constituted a covered peril "because the water caused some of the damage, and water-related damage is not otherwise specifically excluded—making it an 'ensuing loss' and thus a covered loss." Id. at 576. Similarly, in the instant case, the homeowners argue that, even though faulty workmanship "occurred first in time," and caused moisture to accumulate "behind walls and ceilings" of their home, because moisture accumulation caused the mold to develop and because such unknown, hidden moisture accumulation is a covered peril, the damages that follow constitute a covered loss.

The court in TMW Enterprises rejected such reasoning as follows:

> Instead of carving out an exception to [the faulty workmanship] exclusion, this theory of interpretation would create a virtual, if not complete, exclusion of the exclusion. When a policy excludes "loss or damages caused by or resulting from faulty workmanship or construction" of a building, it should come as no surprise that the botched construction will permit the elements—water, air, dirt—to enter the structure and inside of the building and eventually cause damage to both. TMW's chain of reasoning—that water technically was the final causative agent of the damage, as opposed to the faulty construction, that "water damage" is not specifically

10

excluded from the policy, that coverage accordingly applies—essentially undoes the exclusion.

Id. (quotations, ellipses, and brackets omitted).  The court continued:

> As an "all-risk" policy, this insurance policy basically covers everything unless specifically excluded.  That means the number of possibilities for last-in-time "but for" causes of damage are limited only by the imagination of the reader.  What if a roof contains a flawed design, . . . and it leaks water into the house, which ruins one of the floors?  But for the water, no damage to the floor would have occurred.  Yet the contract does not exclude damages caused by "water."  Coverage?  What if faulty construction allows humid summer air to enter the building, which rusts metal fixtures?  But for the exposure to the summer air, no damage to the fixtures would have occurred.  Yet the contract does not exclude damages caused by "air."  Coverage?  What if a poorly constructed ceiling beam falls, smashing the floor below?  But for the force of gravity, no damage to the floor would have occurred.  Yet the contract does not exclude damages caused by "gravity."  Coverage?  As in each of these examples, so too here:  The very risk raised by the flawed construction of a building came to pass.  To say that the risk was not covered because other elements or natural forces were the last causative agents of the damage, though to be sure utterly foreseeable causes of the damages, is to eliminate the exclusion.  It is exceedingly strange to think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified as water damage.

Id. at 576-77 (quotations and citation omitted).

Similarly, here, we conclude that the homeowners' chain of reasoning—that hidden and unknown accumulated moisture was the causative agent of the damage, as opposed to the faulty workmanship; that hidden and unknown accumulated moisture is not specifically excluded from the policy; that coverage accordingly applies—essentially undoes the faulty workmanship exclusion.  See id. at 576.  We agree with the Sixth Circuit Court of Appeals that, when there is an exclusion for loss caused by faulty workmanship, "it should come as no surprise that the botched construction will permit . . . water . . . to enter the structure and inside of the building and eventually cause damage to both."  Id.  This is particularly so in the instant case when, according to the homeowners, the faulty workmanship consists of "ventilation and insulation construction defects."

11

We, likewise, agree with the courts that have concluded that "mold is a natural and expected, as opposed to a separate and independent, result of water damage," and, thus, cannot be an "ensuing loss" of accumulated unknown and hidden moisture. Lillard-Roberts, 2002 WL 31495830, at *20. As the court in Lillard-Roberts explained:

> Though not inevitable, mold is a natural event that often manifests after and as a direct result of the entry of water caused by some other peril, such as a roof opened by a hailstorm, a leaky pipe or defectively installed roof flashing. Mold cannot exist or sustain itself without some moisture source, such as water intrusion. When water intrudes into a residence, mold, unlike fire, is not a surprise . . . .

Id. (footnotes omitted); see Bloom v. Western Nat. Mut. Ins. Co., No. A05-2093, 2006 WL 1806415, at *5 (Minn. Ct. App. July 3, 2006) (explaining that "[i]n order for mold and rot to take hold and cause injury, water or moisture must be present"). "[T]he water intrusion and resulting . . . mold are 'a single phenomenon,'" in that "[t]here was no intervening cause other than time." Bloom, 2006 WL 1806415, at *5. For similar reasons, we reject the homeowners' assertion that mold contamination is an ensuing loss of mold because contamination by the toxins released by mold spores is, somehow, separate and independent from the mold itself. See Cooper v. American Family Mut. Ins. Co., 184 F. Supp. 2d 960, 964-65 (D. Ariz. 2002) (applying Arizona law).

In sum, the ensuing loss provisions in the homeowners' policy do not entitle the homeowners to recover for any of their alleged ensuing losses. See Sapiro v. Encompass Ins., 221 F.R.D. 513, 522 (N.D. Cal. 2004) (applying California law). Under New Hampshire law, an ensuing loss is a loss that is separate and independent from the original excluded peril (here, faulty workmanship). Weeks, 149 N.H. at 177. The homeowners' "losses are neither." Sapiro, 221 F.R.D. at 522. Rather, the homeowners' alleged hidden and unknown accumulated moisture and mold losses are "directly attributable to the initial negligent" workmanship. Id.

The homeowners next contend that, because hidden and unknown accumulated moisture, a covered peril, "is the more direct proximate cause[ ]" of their loss, their loss is covered even though it was "set in motion by a more remote but excluded cause" (faulty workmanship). According to the homeowners, "[p]roximate cause in the context of insurance does not denote the remote or originating cause," but, rather, "refers to the more direct causes which follow the excluded cause."

12

The homeowners' argument rests upon a mistaken premise. The homeowners are mistaken as to the concept of proximate cause in the insurance law context in New Hampshire. New Hampshire, like a majority of jurisdictions, follows the "efficient proximate cause" doctrine. See Nassif Realty Co. v. National Fire Ins. Co., 109 N.H. 117, 119 (1968); Terrien v. Insurance Co., 96 N.H. 182, 185 (1950); see also Phillips & Coplen, supra at 33, 34. "The efficient proximate cause is the risk that sets others in motion." Phillips & Coplen, supra at 39. "If the cause which is determined to have set the chain of events in motion, the efficient proximate cause, is covered under the terms of the policy, the loss will likewise be covered." 7 Steven Plitt et al., Couch on Insurance 3d § 101:45, at 101-85 (2013). Conversely, if the cause that set the other causes in motion is an excluded peril, then the entire claim may be excluded, "even if there are covered events that contributed along the chain of events." Phillips & Coplen, supra at 34, 39. Thus, under the efficient proximate cause doctrine because, as the homeowners assert, their loss was "set in motion" by faulty workmanship (an excluded peril), there is no coverage for their loss.

In other words, the law in New Hampshire is the exact opposite of what the homeowners argue. The homeowners argue that there is coverage for their loss even though an excluded peril set all of the other causes of their loss in motion. However, under New Hampshire law, in fact, the opposite result obtains. Under the efficient proximate cause doctrine, there is no coverage for an insured's loss when the efficient proximate cause of that loss is an excluded peril.

The homeowners next argue that there is coverage for their loss because the anti-concurrent causation provision in paragraph "1." of "Exclusions" and the ensuing loss provisions are inherently contradictory. (Bolding and capitalization omitted.) See Barking Dog, Ltd. v. Citizens Ins. Co. of America, 164 N.H. 80, 85-86 (2012). They contend that, if the anti-concurrent causation provision "is read to take all coverage away for any loss caused directly or indirectly by an excluded peril . . . , then there could never be coverage for an ensuing loss" from that excluded peril.

The conflict the homeowners posit is not present under the facts of this case. As previously explained, the homeowners are not entitled to coverage under the ensuing loss provisions. Thus, even if we were to interpret the anti-concurrent causation provision to "take all coverage away for any loss caused directly or indirectly" by any "excluded peril," there is no conflict between that interpretation of the anti-concurrent causation provision and the ensuing loss provisions under which there, also, is no coverage for the homeowners' loss.

The homeowners' argument is based upon an interpretation of ensuing loss provisions that we have not adopted. See Christopher C. French, The

13

"Ensuing Loss" Clause in Insurance Policies: The Forgotten and Misunderstood Antidote to Anti-Concurrent Causation Exclusions, 13 Nev. L. J. 215, 251 (Fall 2012); see also Weeks, 149 N.H. at 177. Under that broad interpretation, an ensuing loss is one that merely follows (meaning, is subsequent to) an excluded peril. See French, supra at 251; see also Leep v. Trinity Universal Insurance Company, CV 16–57–BLG–TJC, 2017 WL 2457882, at *9-10 (D. Mont. June 6, 2017) (citing cases and concluding, in dicta, that Montana law would broadly interpret an ensuing loss provision). By contrast, in New Hampshire, as in several other jurisdictions, an ensuing loss is one that not only is subsequent to an excluded peril, but is also separate and independent from that peril. See Weeks, 149 N.H. at 177; see also Leep, 2017 WL 2457882, at *9-10 (citing cases); Harrington, supra at 30-34 (citing cases).

The homeowners next contend that we must adopt an interpretation of the policy that comports with their reasonable expectations, which, they assert, were that their loss would be covered. However, that principle applies only when we are "forced to reconcile contradictory clauses in an insurance policy," Barking Dog, 164 N.H. at 86, or when we determine that an ambiguity exists, see Bartlett, 167 N.H. at 531. In those circumstances, "we must adopt the interpretation which most correctly reflects the reasonable expectations of the insured." Barking Dog, 164 N.H. at 86 (quotation omitted); see Bartlett, 167 N.H. at 531. The principle does not apply to this case given that the homeowners do not argue that the policy provisions are ambiguous and that we have rejected their assertion that the anti-concurrent causation provision and the ensuing loss clauses are contradictory. We have reviewed the homeowners' remaining arguments and conclude that they do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

Affirmed.

HICKS, LYNN, and BASSETT, JJ., concurred.